Andrew Magdy Kamal
Suite 300-MB #038
801 W. Big Beaver Road
Troy, MI 48084
(616)541-9038
andrew@starkdrones.org

Plaintiff in *pro per*

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| ANDREW MAGDY KAMAL, ) | |
|       Plaintiff, ) | |
| ) | Case No. **24-12073** |
|   vs. ) | |
| FORD MOTOR COMPANY, ) | |
|       Defendant(s) ) | Judge Laurie Jill Michelson |

**MOTION FOR RECUSAL OF DISTRICT JUDGE**

NOW COMES Andrew Magdy Kamal, Plaintiff, and files this Motion for Recusal of Judge Laurie Jill

Michelson, and for cause would show this Honorable Court as follows:

### A.  INTRODUCTION

    1.    This motion is filed with the utmost respect for the Court and the judiciary.

    2.    However, a review of recently discovered facts reveals a pattern of professional

connections and public associations between Judge Michelson and counsel for Defendant, Liz Hardy of

the firm Kienbaum Hardy Viviano Pelton Forrest, and the broader legal community associated with that

firm and its principals.

---

MOTION FOR RECUSAL OF DISTRICT JUDGE - 1

3.      When combined with procedural rulings in this case that have severely prejudiced Plaintiff, these associations would cause a reasonable, objective member of the public to question the Court's impartiality.

4.      To preserve the integrity of these proceedings and public confidence in the judiciary, recusal is both prudent and required by law.

## B.  MEET AND CONFER STATEMENT

5.      Pursuant to Eastern District of Michigan Local Rule 7.1(a)(2)(C), concurrence in the accompanying Motion for Recusal has not been obtained. This omission is justified due to the emergent nature of the relief requested. The grounds for recusal arose and were discovered on January 8th, 2026, and prompt judicial consideration is necessary to protect the integrity of the proceedings and to avoid further action before a judge whose impartiality might reasonably be questioned.

## C.  FACTUAL BACKGROUND

6.      On or about January 22, 2025 Judge Michelson appeared as a speaking panelist at an event alongside Liz Hardy, an attorney at the law firm Kienbaum Hardy Viviano Pelton Forrest. This firm represents the Defendant in this action through its attorney, Ryan Bohannon. *See* **Exhibit 1**.

7.      Public records indicate that Judge Michelson served as an Advisory Member for the State Bar of Michigan's United States Courts Committee during the 2010/2011 term.

8.      During that same period, Thomas G. Kienbaum, a founding name-partner of Kienbaum Hardy Viviano Pelton Forrest, the firm representing Defendant, served as a member of the State Bar's Past Presidents' Advisory Council.

9.      The law firm representing Defendant, Kienbaum Hardy Viviano Pelton Forrest, has repeatedly featured and highlighted cases presided over by Judge Michelson in its firm-sponsored

magazine: in the Winter 2018 issue (*See* **Exhibit 2**); in the Summer 2018 issue (*See* **Exhibit 3**); and a Winter 2019 issue (*See* **Exhibit 4**).

10.     The aforementioned panelist discussion featuring Judge Michelson and Liz Hardy of the defense firm was also publicized in a newsletter of the Eastern District of Michigan Chapter of the Federal Bar Association ("FBA"). *See* **Exhibit 5**, which cross-references and corroborates **Exhibit 1**.

11.     During Judge Michelson's tenure as President of the FBA's Eastern District of Michigan Chapter, Karen Kienbaum (whose surname is shared with the founding member of Defendant's counsel's firm) volunteered at the Chapter's President's Luncheon. *See* **Exhibit 6**.

12.     In the 2017-2018 bar year, Defendant's counsel's firm, Kienbaum Hardy Viviano Pelton Forrest, was listed as a sponsor for the FBA Eastern District Chapter's Luncheon Program. This program included a "Law Clerk Happy Hour" event. *See* **Exhibit 7**.

13.     For the 2023/2024 program year, Defendant's counsel's firm, along with the Defendant Ford Motor Company itself, were listed as financial "Sustainers" of the FBA's Eastern District Chapter. *See* **Exhibit 8**.

14.     Within the context of this litigation, the Court permitted Defendant's counsel, Ryan Bohannon of Kienbaum Hardy Viviano Pelton Forrest, to depose the Plaintiff a second time, despite the fact that core technical discovery relevant to that deposition topic had not been completed. *See* **Exhibit 9**.

15.     In recent correspondence, Defendant's counsel has taken the position that procedural rules governing discovery and motions should be applied differently to the Plaintiff than they apply to the Defendant. *See* **Exhibit 10**.

16.     The procedural posture of this case, including the contested discovery issues referenced above, has created a "chicken and egg" problem that has significantly delayed technical discovery for over six months to the severe prejudice of Plaintiff. (See also ECF Doc. 45).

17.     This delay operates to the distinct advantage of Defendant, who retains all core documentation, while the dispositive motion cut-off date of April 6, 2026, rapidly approaches.

### D.  LEGAL STANDARD FOR RECUSAL OF A DISTRICT JUDGE

18.     Section 455 provides in relevant part:

    a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

    b) He shall also disqualify himself in the following circumstances:

        1. Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . .

19.     The question is whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. Id. (quoting *Mayes v. Leipziger*, 729 F.2d 605, 607 (9th Cir. 1984)).

20.     Thus, on review, a court does not have to conclude that actual bias exists, but rather that a judge's impartiality might reasonably be questioned. This standard is similar to that which the Ninth Circuit applies when considering whether to order that a case be reassigned when claims of bias by the district judge are raised on appeal. For reassignment, the relevant question is whether circumstances establish that "to a reasonable outside observer . . . reassignment 'to maintain the appearance of justice'

is necessary." *Nat.l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1045-46 (9th Cir. 2015) (quoting *United States v. Kyle*, 734 F.3d 956, 966–67 (9th Cir. 2013).

21.    "[A] judge must recuse [himself] if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality." *United States v. Hartsel*, 199 F.3d 812, 820 (6th Cir. 1999) (quoting *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990)).

22.    Although recusal often requires extrajudicial evidence, a party can establish a proper basis for recusal without such evidence where on-the-record statements demonstrate a "deep-seated . . . antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 554-55 (1994).

## E.  ARGUMENT

**i.    A Reasonable Observer Would Question Impartiality Given the Repeated Professional and Public Associations Between the Judge and the Defense Firm**

23.    The objective standard of 28 U.S.C. § 455(a) requires recusal where a reasonable, fully informed observer would perceive a risk of partiality.

24.    Here, the cumulative weight of Judge Michelson's documented associations with the law firm of Kienbaum Hardy Viviano Pelton Forrest, which is actively litigating before her through attorney Ryan Bohannon, creates precisely such a reasonable perception.

25.    While it is common and expected for judges to participate in bar associations, the nature and repetition of these specific interactions transcend mere membership and venture into the appearance of a sustained professional alliance with the opposing party's firm.

26.    First, Judge Michelson chose to share a public, professional platform with Liz Hardy, a prominent attorney at the firm currently advocating against Plaintiff in this courtroom. (*See* **Exhibits 1 & 5**). This joint appearance was not a passive gathering but a curated event highlighting their shared

---

MOTION FOR RECUSAL OF DISTRICT JUDGE - 5

expertise, fostering a public perception of collegiality and mutual professional respect between the Judge and the firm.

27.     Second, the defense firm has engaged in a pattern of publicly highlighting Judge Michelson's judicial work. The firm's magazine featured her decisions not once, but three times across two years. (*See* **Exhibits 2, 3, 4**).

28.     To a reasonable observer, this repeated publicity is not neutral; it signals a particular familiarity with and approval of the Judge's jurisprudence, creating an impression of a reciprocal professional relationship. This impression is compounded by their shared history in State Bar committee leadership alongside the firm's namesake, Thomas G. Kienbaum.

29.     Third, the financial and organizational ties through the Federal Bar Association (FBA) are striking. The defense firm was a sponsor of FBA events during Judge Michelson's presidential tenure and remained a financial "Sustainer" of the chapter.

30.     The Defendant, Ford Motor Company, is also listed as a Sustainer. A reasonable person, aware that the Judge once presided over an organization that the opposing party and its law firm helped fund, could question whether such support, even if directed to the chapter, creates an atmosphere of indebtedness or preferred access.

31.     Critically, the "reasonable observer" is aware that law firms are integrated professional entities. See, e.g., Code of Conduct for U.S. Judges, Canon 2, Cmt. (advising caution regarding appearances with lawyers who may appear before the court). An appearance with Liz Hardy is, in the public eye, an appearance with the firm of Kienbaum Hardy.

32.     Publicity by the firm is publicity by the entity opposing Plaintiff. Sponsorship by the firm is support from the organization whose attorneys are seeking favorable rulings. The connections are not

diluted because attorney Ryan Bohannon, rather than Liz Hardy, signs the pleadings; they are amplified because they demonstrate a broad, firm-wide nexus to the Court.

33.     When these repeated, public, and financial intersections are viewed together, they paint a picture of a close-knit professional community from which Plaintiff is excluded. This creates an "appearance of favoritism" toward the defense firm that is impermissible under § 455(a).

34.     The Court's impartiality might reasonably be questioned, not due to any alleged actual bias, but because the totality of circumstances suggests an environment where the defense enjoys a degree of familiarity and access that Plaintiff does not.

35.     To preserve the integrity of these proceedings and public confidence in the judiciary, this appearance must be eradicated through recusal.

ii.     **The Appearance of Partiality is Compounded by Procedural Rulings That Have Prejudiced Plaintiff and Benefitted Defendant**

36.     The legal standard under 28 U.S.C. § 455(a) requires a consideration of all the circumstances.

37.     Here, the objective appearance of a close professional association with the Defendant's firm is not an isolated matter; it is powerfully compounded by a pattern of procedural rulings that have operated to the systematic disadvantage of the Plaintiff and to the distinct advantage of the Defendant.

38.     When viewed together, these circumstances would solidify a reasonable observer's concern about the Court's impartiality.

39.     First, the Court permitted Defendant's counsel, Ryan Bohannon of the Kienbaum Hardy firm, to take a second deposition of the Plaintiff before the completion of the core technical discovery that was a prerequisite for a fair and meaningful deposition. (*See* **Exhibit 9**).

40.     This ruling turned the logical sequence of discovery on its head, creating the very "chicken and egg" problem that has stalled this case for over six months.

41.     The resulting prejudice is severe: Plaintiff has been examined exhaustively without the necessary foundational discovery, while the dispositive motion deadline of April 6, 2026, now looms.

42.     This timeline overwhelmingly benefits the Defendant, who controls all relevant documentation and has not been similarly deposed.

43.     Second, Defendant's counsel has adopted litigation positions advocating for the inconsistent application of procedural rules, implying that stricter standards should govern Plaintiff's conduct than its own. (*See* **Exhibit 10**).

44.     When such positions are advanced by a firm with the documented, repeated professional connections to the presiding Judge as outlined above, a reasonable person may question whether the firm feels emboldened by a perceived familiarity or association, and more importantly, whether the Court could be unconsciously influenced by it.

45.     The cumulative effect is decisive. A reasonable member of the public, aware that the Judge shares public platforms with attorneys from the defense firm, and that the firm regularly publicizes her work, would see the subsequent procedural rulings, which have tangibly and dramatically prejudiced the opposing party, through a lens of potential favoritism.

46.     The rulings provide substantive, outcome-affecting consequences that give weight to the otherwise circumstantial appearance of association.

47.     They transform a speculative concern into a reasonable one: whether the Defendant's firm is receiving a subtle, unconscious benefit from its professional proximity to the Court.

48.     To preserve the integrity of these proceedings and the public's faith in their fairness, this compounding appearance must be resolved through recusal.

MOTION FOR RECUSAL OF DISTRICT JUDGE - 8

### iii.     Recusal is Necessary to Preserve Public Confidence in the Integrity of the Proceedings

49.     The Supreme Court has held that the purpose of 28 U.S.C. § 455(a) is not merely to ensure actual impartiality, but "to promote public confidence in the integrity of the judicial process" by requiring recusal whenever a judge's impartiality "might reasonably be questioned." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864-65 (1988).

50.     Here, the confluence of repeated, public professional associations between the Court and the defense firm, viewed alongside procedural rulings adversely affecting Plaintiff, creates a reasonable appearance that requires recusal to safeguard public trust.

51.     First, a well-informed observer would perceive more than incidental contact. The recent joint appearance on a professional speaking panel between Judge Michelson and Liz Hardy, a senior attorney at the very firm representing Defendant, is a direct, collaborative professional association. This is not passive membership in a large bar association; it is an active, public sharing of a platform that signals professional collegiality and mutual respect.

52.     When this event is then publicized in a newsletter, and the defense firm itself has repeatedly chosen to highlight the Judge's judicial work in its own promotional magazine over multiple years (*See* **Exhibits 2-4**), an objective observer would see a pattern of positive, public interconnection.

53.     The firm's sustained publicity of the Judge's work is not a neutral act; it is an affirmative choice that, to the public eye, fosters an association between the bench and that specific firm.

54.     Second, an observer would note the institutional and financial ties between the Court's voluntary bar leadership and the defense firm. The Judge's past leadership role in the local FBA chapter is commendable.

55.     However, the context matters: during her presidency, a volunteer with the Kienbaum surname was active, the firm was a financial sponsor of chapter events she oversaw, and both the firm and the Defendant have been recent financial sustainers of the chapter.

56.     While such support is common, its totality, when combined with the direct panelist association, contributes to a perceptible ecosystem of connection between the Court and the Defendant's representatives.

57.     Third, the procedural rulings in this specific case magnify the appearance created by these external associations.

58.     An objective observer, aware of the above connections, would then learn that Plaintiff, facing this interconnected adversary, has been subjected to a second deposition before key discovery was complete, has faced arguments from defense counsel for a disparate application of rules, and has been mired in a discovery delay of over six months to its severe prejudice as the dispositive motion deadline looms. The observer need not conclude that the external associations caused these rulings.

59.     Under § 455(a), the critical question is whether the appearance of influence or favoritism has been created. The coalescence of public professional associations with a pattern of litigation events disproportionately disadvantaging one party is precisely what would lead a reasonable, thoughtful member of the public to question the Court's neutrality.

60.     To eliminate this cloud over the proceedings and fulfill the imperative of § 455(a), voluntary recusal is the necessary and prudent course. It would decisively assure all parties and the public that the remainder of this litigation, including critical upcoming dispositive motion practice, will be conducted before a tribunal whose absolute neutrality is beyond any reasonable question.

61.     Preserving the integrity of the judicial process in this high-stakes matter demands nothing less.

## F.  <u>PRAYER FOR RELIEF</u>

REASONS WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests this Honorable

Court to GRANT him the following reliefs:

a.  GRANT this Motion for Recusal pursuant to 28 U.S.C. § 455(a);

b.  ISSUE AN ORDER that the Honorable Laurie Jill Michelson recuse herself from all further proceedings in the above-captioned matter;

c.  DIRECT THE CLERK OF COURT to reassign this case to another District Judge of this Court who maintains the least demonstrable professional or social ties to counsel for Defendant or the Defendant itself, thereby ensuring the absolute and unambiguous appearance of fairness and judicial integrity; and

d.  FOR SUCH OTHER AND FURTHER RELIEF as this Court deems just and proper.

Dated this 17th day of January 2026.

Respectfully Submitted,


s/Andrew Magdy Kamal/

_____

Andrew Magdy Kamal,
Plaintiff in *pro per*
801 W. Big Beaver Rd
Suite 300-MB #038
Troy, MI 48084
616-541-9038
andrew@starkdrones.org

_____

# <u>Exhibit 1</u>



Public Notice *Quick Search*

i.e. Detroit foreclosures

Advanced Search
What is a public notice?                                                    Disclaimer

*legal News +*      *public Notices*      *about Us +*

# Oakland County Legal News

Home      Calendar      Statistics      Courts      Classifieds      Notices      Columns      Archives
Contact Us

**Posted** December 24, 2024

Tweet This | Share on Facebook

## 'Women Helping Women Event' planned for January 22

 ALTERNATIVE DISPUTE RESOLUTION SECTION

The Eastern District of Michigan. Bar Association will present its first "Women Helping Women Event" on Wednesday, January 22, from 4:30 to 7:30 p.m. at the offices of Warner Norcross + Judd LLP, 2715 Woodward Ave, suite 300, in Detroit.

The event is designed with the practicing federal female lawyer in mind.  Panel discussion will focus on issues most relevant to women lawyers practicing in the Eastern District of Michigan.

Panelists include U.S. District Court Judge Laurie Michelson, Eastern District of Michigan; Jennifer Greico of Altior Law; Liz Hardy of Kienbaum, Hardy, Viviano, Pelton ,& Forrest PLC; and Megan Norris of Miller Canfield.

Cost for the event is $41 for members and $61 for non-members/guests. To register, visit https://edmibar.org and click on "events."


DOWNLOAD
Download a PDF of this paper!

## *headlines* Oakland County

- No expiration date: Businessman passes bar exam after the age of 50
- Oakland County provides update on legionella prevention and water system management
- Board of Commissioners seeking nominations for 2026 Black Excellence Award
- Law school conducts winter commencement for Lansing campus
- Two Michigan courthouses voted among the most beautiful public buildings in America

## *headlines* National

- [Could Trump's judicial appointments slow in the new year?](#)
- [ACLU and BigLaw firm use 'Orange is the New Black' in hashtag effort to promote NY jail reform](#)
- [Practical guidance for ethically changing law firms](#)
- ['Christmas Lawyer' uses settlement with homeowners association on more holiday decorations](#)
- [DOJ sues state officials over laws protecting immigrants at courthouses](#)
- [Building the case for trial in the last 60 days](#)



You are here: **Home**   ARTICLES

## Newspapers

Detroit
Macomb
Oakland County
Flint-Genesee County
Ingham County
Washtenaw County
Jackson County
Grand Rapids
Muskegon (Norton-Lakeshore)
The Climax Crescent
Zeeland Record

## Legal News

Advertise With Us
Subscriptions
Forms
About Us
Contact Us
Newstands
Public Notice Policies

## Contact Us

Detroit Legal News Publishing LLC
165 Kirts Blvd, Ste 300
Troy, Michigan 48084

Phone: (248) 577-6100
Toll Free: (800) 875-5275
Fax: (248) 577-6111

FOLLOW US ON twitter   BECOME A FAN 

# Exhibit 2

**Acceptance Of Arbitration** *from page 14*

Arbitration is, of course, a matter of contract. A party cannot be required to submit to arbitration any dispute which it has not agreed to submit. When a dispute over arbitrability is brought to court, the court must decide whether a valid agreement to arbitrate exists between the parties and whether the matter at issue falls within its scope.

FCA argued in *Cerjanec* that employees who continued to work for Chrysler after receiving notice of the EDRP's implementation in 1995 had thereby entered into binding agreements to arbitrate. U.S. District Judge Laurie Michelson disagreed. She found that recent appellate court decisions that had so concluded had also made clear that "continued employment can manifest assent [only] when the employee knows that continued employment manifests assent."

Judge Michelson rejected FCA's argument that the EDRP brochure advising employees that "IT APPLIES TO YOU" and that the EDRP "will govern all future legal disputes between you and Chrysler" adequately put employees on notice that continued employment would constitute assent. In her view, an express statement was required that continued employment would constitute acceptance. Because FCA could not prove that, the court held that no valid agreement to arbitrate had been formed, and the employees' lawsuit was allowed to go forward.

The traditional foolproof way for an employer to be sure its arbitration policy will be enforceable is to obtain each employee's (or applicant's) signed acknowledgement — or an electronic equivalent — that the employee has received, reviewed, and understood the binding effect of the policy. If the size of the workforce or logistical issues make obtaining individual expressions of assent impracticable, the policy or an accompanying memo should contain a clear and preferably bolded notice that an employee's continuing employment will mean that he or she assents to having disputes resolved exclusively through arbitration.

*Noel D. Massie*

# NLRB In Hiatus

As we sent this issue for publication, the National Labor Relations Board was again in an hiatus between being a 3-2 Republican majority "Trump Board" for a few weeks last December and going back to a 2-2 deadlocked Board after one of the Republican members (Phillip Miscimarra) reached the end of his term. A replacement Republican (John Ring) has been nominated but not yet confirmed by the Senate — which could happen at any time. During the Republican majority last December, several notable things happened:

1. The new Republican General Counsel (Peter Robb) issued a wide-ranging Memorandum to Regional Offices on December 1 identifying 15 broad categories of cases he would like to present to the Trump Board (when fully constituted) that would reverse decisions of the Obama Board — decisions that had changed or expanded rules in a fashion that favored unions and employees at the expense of employers. He also rescinded several of his predecessor's policy memoranda. With 15 broad categories to overturn, this could take some time.

2. On December 11, the Republican Board issued a decision in *UPMC* clarifying an administrative law judge's authority to accept a settlement of a case without the concurrence of the Regional Office or the charging party, so long as it met a "reasonableness" standard — something that should make employer-proposed settlements much easier.

3. On December 12, the Board issued a "Request For Information" seeking comment from the labor community on the 2014 "quickie election rule" — *i.e.*, whether it should be retained, modified, or rescinded.

4. On December 14 and 15, the Board issued four major substantive decisions, reversing Obama Board expansions — all on the eve of Miscimarra's departure:

● *The Boeing Company* reversed the standard for assessing whether facially neutral employer-promulgated work rules interfered with employees' Section 7 rights to engage in protected activity. General workplace civil-



**NLRB In Hiatus** *from page 15*

ity rules — which the Obama Board had made a habit of attacking — should be upheld under this standard.

● *PCC Structurals* overruled *Specialty Healthcare* (2011) which had made union organizing much simpler based on a new "micro-unit" concept. Returning to the prior test for appropriate units will make it harder for unions to carve out artificially small work groups.

● In *Raytheon Network Centric Systems*, the Board overruled *E.I. duPont deNemours* (2016) which had constricted an employer's right to make periodic changes (*e.g.,* annual adjustments to healthcare costs and benefits) without bargaining to agreement with a union representing affected employees.

● *Hy-Brand Industrial Contractors* reversed the Obama Board's dramatic and controversial expansion of the "joint employer" concept in *Browning-Ferris Industries* (2015), and restored the Board's decades-long adherence to a "direct and immediate control" test that looked at the *actual exercise of control* over the terms of a contractor's employees' employment. Under *Browning-Ferris*, the mere theoretical right of "indirect control" sufficed even though never exercised. The Obama General Counsel had proceeded after *Browning-Ferris* to prosecute McDonald's USA LLC along with its fran-

chisees for unfair labor practices allegedly committed by the franchisees. Shortly after the *Hy-Brand* decision was released, the new General Counsel suspended the proceeding against McDonald's and its franchisees, and also requested that the U.S. Court of Appeals for the D.C. Circuit return the *Browning-Ferris* appeal to the Board for further review under the new *Hy-Brand* standard.

Then something remarkable happened. On February 9, 2018, the NLRB's Inspector General issued an ethics opinion that Board Member William Emanuel should not have participated in the *Hy-Brand* case because his former law firm had represented one of the employers in the *Browning-Ferris* case and the deliberations leading to the *Hy-Brand* decision were essentially a continuation of the *Browning-Ferris* case. Based on that opinion, on February 26 the Board disqualified Member Emanuel and declared the *Hy-Brand* decision null and void. That reinstated — at least for a time — the controversial *Browning-Ferris* "joint employer" test. The Board recently asked the D.C. Circuit to reinstate the appeal in the *Browning-Ferris* case. The McDonald's case has just settled. Who knows what will happen next.

*Theodore R. Opperwall*



*Representing management nationally in all aspects of labor and employment law, including preventive counseling, employment litigation, non-compete and other business covenant claims, alternative dispute resolution, and traditional labor relations matters*

280 North Old Woodward Avenue, Suite 400, Birmingham, Michigan 48009
Phone (248) 645-0000 • Fax (248) 645-1385
www.kohp.com

© 2018 Kienbaum Opperwall Hardy & Pelton, P.L.C. *Insight* is published periodically to offer timely perspectives on legal issues in the employment and labor field. The information contained in this newsletter is not legal advice. If you wish to discuss a matter that is similar in nature to a case or development covered in this newsletter, or if you wish to be added to our mailing list, please contact us at our Birmingham office.

# Exhibit 3

**80th Anniversary Of The Anachronistic FLSA** *from page 12*

**Recordkeeping and Overtime Pay Requirements.** Maintaining accurate records of hours worked is essential. But correctly calculating the regular rate of pay on which overtime is based is also essential, and can be complex where pay rates vary and bonuses are paid.

**State Law Issues.** Most states have their own wage and hour laws that may differ from, and often exceed, the requirements under the federal FLSA. The FLSA governs minimum wage and overtime, but many states have specific requirements on when and how wages and fringe benefits are paid, special rules for breaks and meals, and a higher minimum wage. Some states also require overtime pay on a more favorable basis.

Some efforts are underway to modernize the FLSA. But the chances of real reform in Congress that would balance the needs of today's employers and the desire for flexibility for employees seem doomed to political dysfunction. While we wait for future reform, employers would do well to closely review their pay practices, especially when providing more liberal or flexible alternatives to traditional work schedules.

*Eric J. Pelton*

# Recent ADA And FMLA Decisions Of Note

Here are some noteworthy federal decisions applying the Americans with Disabilities Act (ADA) and the Family and Medical Leave Act (FMLA).

**Voluntary Work While on FMLA Does Not Violate FMLA.** In *D'Onofrio v. Vacation Publications*, the U.S. Court of Appeals for the Fifth Circuit addressed and rejected D'Onofrio's claim that her FMLA rights were interfered with because she worked while on leave. D'Onofrio was a sales representative who requested FMLA leave to care for her husband. Her employer gave her the option of either taking unpaid leave or periodically working remotely to service her existing accounts, so she could keep commissions from her accounts while on leave. D'Onofrio agreed to periodically work. But when D'Onofrio failed to respond to customers during her leave, her employer locked her out of her accounts, and, mistakenly, sent an email to her customers stating that she was no longer employed. D'Onofrio then sued, claiming that her employer had improperly asked if she wanted to work during her FMLA leave. The court held that "giving employees the option to work while on leave does not constitute interference with FMLA rights so long as working while on leave is not a condition of continued employment." The court, nevertheless, noted that an employer may violate an employee's FMLA rights by requiring her to work while on FMLA leave.

**"100% Healed" Policy Results in $3.5 Million EEOC Settlement.** In June 2018, a gaming company that operates slot machine taverns and casinos in Nevada and Montana agreed to pay $3.5 million (and other affirmative relief) to settle an EEOC lawsuit alleging systemic disability discrimination in violation of the ADA. The EEOC alleged that Nevada Restaurant Services' company-wide practice of requiring employees with medical conditions to be 100% healed before returning to work violated the ADA because it was an "unlawful qualification standard that does not allow for reasonable accommodation of qualified individuals with disabilities." The policy did not allow for an interactive process or reasonable accommodation for disabled employees who could perform essential job duties. In addition to paying $3.5 million to the alleged victims of discrimination, the employer agreed to retain a consultant with ADA expertise to review and revise disability policies, implement ADA training for staff, and develop a centralized tracking system for requests for disability accommodations.

**Full-Time Attendance at Work Not Necessarily an Essential Job Function.** In *Hostettler v. College of Wooster*, the U.S. Court of Appeals for the Sixth Circuit overturned a summary judgment ruling in favor of the

# Insight

## Recent ADA And FMLA Decisions Of Note *from page 13*

employer and held that a jury should decide whether full-time work was an essential function of the employee's job. Hostettler was a Human Resources Generalist who returned from a maternity leave with medical restrictions that required her to work on a part-time basis. She agreed to work in the office half days, and perform some work at home in the afternoons. The college accommodated her reduced schedule for several months but later terminated her when she was unable to return to work in a full-time capacity, claiming that it was placing a strain on the department. There was a dispute, however, about whether Hostettler's schedule was truly problematic. Her manager gave her a performance review that stated she was doing a good job with no mention of problems with her reduced schedule, and could not identify any specific tasks that she failed to complete in a timely manner. The court held that full-time in-office presence is not, *standing alone*, an essential job function. It must be tied to some other job requirement: "An employer cannot deny a modified work schedule as unreasonable unless the employer can show why the employee is needed on a full-time schedule; merely stating that anything less than full-time is *per se* unreasonable will not relieve an employer of its ADA responsibilities."

**Overtime Work and Rotating Shifts Can Be Essential Job Functions.** *In McNeil v. Union Pacific Railroad*, a Nebraska U.S. District Court affirmed that overtime can be an essential job function. McNeil was a Critical Call Dispatcher who was responsible for coordinating responses to railroad incidents, notifying government agencies about critical incidents, and preparing related reports. Dispatchers were subject to mandatory overtime based on need, and could be called on to begin



a shift four hours before the standard start time or remain at work four hours after the standard quit time. Upon her return from a disability leave for depression and anxiety, McNeil submitted medical restrictions that she could only work daytime hours and no overtime. The railroad terminated McNeil because it could not accommodate a permanent overtime restriction and there were no day shifts available. The court granted summary judgment for the employer, noting that overtime requirements have been recognized as an essential job function, and a review of the dispatchers' duties showed that the ability to work overtime was an essential function of her position.

Similarly, in *Faidley v. UPS*, the U.S. Court of Appeals for the Eighth Circuit held that UPS did not violate the ADA by refusing Faidley's request for an eight-hour shift limitation, because that accommodation would have rendered him unqualified to perform the essential functions of his driver position, which required working 9.5 hours per day. If a UPS driver could not work overtime, other drivers would have to complete his deliveries after their own, or his deliveries would be untimely, both of which would negatively impact business. The court relied on the facts that the overtime requirement had been collectively bargained and was specified in the job description.

The U.S. Court of Appeals for the First Circuit found that working rotating shifts can be an essential job function. In *Sepulveda-Vargas v. Caribbean Restaurants*, an Assistant Manager at a Burger King requested assignment to a fixed schedule to accommodate his depression and PTSD after being attacked at gunpoint while making a bank deposit for the restaurant. The employer initially complied with his request, but later

**Recent ADA And FMLA Decisions Of Note** *from page 14*

informed him that he would have to go back to rotating shifts, which were necessary for fair and equal work distribution among the managerial staff. The court held that he was not a "qualified individual" under the ADA, and that the employer's temporary compliance with the requested restriction did not render rotating shifts a non-essential function, stating "[t]o find otherwise would unacceptably punish employers from doing more than the ADA requires. . . ."

**Model FMLA Forms Expire.** Employers who use the U.S. Department of Labor's (DOL's) model forms to meet notice and other requirements under the FMLA may have seen that the DOL's model forms expired on May 31, 2018. That date was extended to July 31, 2018, and will be extended on a month-by-month basis until the Office of Management and Budget completes its review. Every three years the DOL is required to submit its FMLA forms to the OMB for approval. The DOL has asked the OMB to approve the existing model forms for another three-year period (to 2021), and thus no changes are presently expected. Employers may use the DOL's current model forms until new ones are released. Updates can be tracked on the DOL's FMLA website.

*Shannon V. Loverich*

# What Will Follow Epic's Resolution of the Struggle Over Class Arbitration?

On May 21, 2018, a divided U.S. Supreme Court decided a trio of cases consolidated under the name *Epic Systems Corp. v. Lewis*. The 5 to 4 majority held as a matter of law that an employee's waiver of his or her right to participate in a class or collective action, incorporated into an employer's "voluntary" arbitration program, was enforceable notwithstanding the provisions of the National Labor Relations Act that protect employees' right to engage in "concerted" activity.

After almost a decade of conflicting decisions by the NLRB and the federal appeals courts, it is now settled that arbitration agreements or policies, which are usually presented to employees as non-negotiable terms, can lawfully be used to prevent employees from pursuing employment-related claims in any forum other than a one-at-a-time arbitration in which they will likely face a sophisticated and better funded employer.

Because *Epic* has generated voluminous commentary in the past few months, we will address this question: What is likely to come next regarding the enforceability of employer-mandated arbitration agreements or policies that bar class or collective claims?

**Scope of the *Epic* Decision**. The three cases decided in *Epic* were Fair Labor Standards Act wage and hour "collective" actions, in which the typical plaintiff's claim is small. Justice Gorsuch's majority opinion did not address whether the same outcome would apply to non-FLSA claims, but his reasoning seems to apply across the full range of employment claims. Justice Ginsburg's dissent, joined by all members of the Court's "liberal" wing, warned that the majority decision would inevitably result in "the under-enforcement of federal and state statutes designed to [protect] vulnerable workers" and undermine the role that legal actions brought by groups of plaintiffs play in eradicating workplace discrimination. Justice Ginsburg stressed that it would be anomalous to forbid group claims of disparate impact discrimination which, by their nature, require proof of disadvantage for a protected group with many members. Some courts have held that single plaintiffs cannot sue alleging disparate impact discrimination.

**Potential Drawbacks and Backlash?** Wishes that are granted sometimes bring unexpected consequences. Some employee advocates predict that employers will find themselves inundated with individual arbitrations that, in the aggregate, will prove as burdensome to defend as litigating a class or collective action. That



## What Will Follow *Epic*'s Resolution of the Struggle Over Class Arbitration? *from page 15*

prospect seems unlikely, however, for it is not economically rational for plaintiffs' attorneys to pursue a multitude of small individual claims.

Employee advocates may also try to marshal public opinion and consumer pressure against companies that restrict employee lawsuits through allegedly "coerced" waivers of the right to take concerted action. Here, too, it seems unlikely that a technical procedural issue can generate the level of public pressure necessary to bring about widespread change.

But in the "me too" era, the area of sexual harassment could prove to be an exception. Some states (*e.g.*, New York) have passed laws that exclude harassment claims from the reach of mandatory arbitration. But can they survive a federal preemption challenge? Some large employers have already voluntarily redrafted their policies to make arbitration of harassment claims optional, and more are expected to follow.

Congressional objection to the *Epic* decision appears unlikely, at least in the near term.

Meanwhile, the governor of Washington has issued an executive order directing state agencies to try to contract only with companies that do not require employees to waive the right to participate in collective or class actions. If more states were to follow, that could create pressure on corporate bottom lines.

**Arbitration Procedure Details.** The most recent pro-arbitration decisions have only paid lip service to the principle that an arbitration agreement must satisfy general state law requirements for an enforceable contract. In light of *Epic*, employers should expect arbitration agreements to be carefully scrutinized as to whether the text of the agreement or policy was provided or made available to employees, and whether employees were adequately informed as to when their conduct (or silence) would communicate consent. A local example of such analysis is Michigan U.S. District Judge Laurie J. Michelson's post-*Epic* opinion in *Williams v. FCA US LLC*, finding that Chrysler/FCA's communications to employees did not adequately inform them that continuing employment would manifest assent to the company's arbitration policy. Other procedural features of arbitration policies are also likely to be fly-specked, such as: Is there a genuinely unbiased decision-maker, an adequate opportunity for an employee to develop evidence, and available remedies as provided in a governing statute?

*Noel D. Massie*



*Representing management nationally in all aspects of labor and employment law, including preventive counseling, employment litigation, non-compete and other business covenant claims, alternative dispute resolution, and traditional labor relations matters*

280 North Old Woodward Avenue, Suite 400, Birmingham, Michigan 48009
Phone (248) 645-0000 • Fax (248) 645-1385
www.kohp.com

© 2018 Kienbaum Opperwall Hardy & Pelton, P.L.C. *Insight* is published periodically to offer timely perspectives on legal issues in the employment and labor field. The information contained in this newsletter is not legal advice. If you wish to discuss a matter that is similar in nature to a case or development covered in this newsletter, or if you wish to be added to our mailing list, please contact us at our Birmingham office.

# Exhibit 4

# WHAT WILL FOLLOW *EPIC'S* RESOLUTION OF A DECADE-LONG STRUGGLE OVER CLASS ARBITRATION?

Noel D. Massie
*Kienbaum Opperwall Hardy & Pelton, P.L.C.*

On May 21, 2018, a divided U.S. Supreme Court decided a trio of cases consolidated under the name *Epic Systems Corp. v. Lewis*. The 5–4 majority held as a matter of law that an employee's waiver of his or her right to participate in a class or collective action, incorporated into an employer's "voluntary" arbitration program, was enforceable notwithstanding the provisions of the National Labor Relations Act that protect employees' right to engage in "concerted" activity.

After almost a decade of conflicting decisions by the NLRB and the federal appeals courts, it is now settled that arbitration agreements or policies, which are usually presented to employees as non-negotiable terms, can be used to prevent employees from pursuing employment-related claims in any forum — other than a one-at-a-time arbitration in which they may face a more sophisticated and better funded employer.

Because *Epic* has generated voluminous commentary in the past few months, we will address this question: What is likely to come next regarding the enforceability of employer-mandated arbitration agreements or policies that bar class or collective claims?

**Scope of the *Epic* Decision.** The three cases decided in *Epic* were Fair Labor Standards Act wage-and-hour "collective" actions, in which the typical plaintiff's claim is small. Justice Gorsuch's majority opinion did not address whether the same outcome would apply to non-FLSA claims, but his reasoning seems to apply across the full range of employment claims. Justice Ginsburg's dissent, joined by all members of the Court's "liberal" wing, warned that the majority decision would inevitably result in "the under-enforcement of federal and state statutes designed to [protect] vulnerable workers" and undermine the role that legal actions brought by groups of plaintiffs play in eradicating workplace discrimination. Justice Ginsburg stressed that it would be anomalous to forbid group claims of disparate impact discrimination which, by their nature, require proof of disadvantage to a protected group with many members. Some federal courts have held that single plaintiffs cannot bring suits alleging disparate impact discrimination.

**Potential Drawbacks and Backlash?** Wishes that are granted sometimes come with unexpected consequences. Some employee advocates predict that employers will find themselves inundated with individual arbitrations that, in the aggregate, will prove as burdensome to defend as litigating a class or collective action. That prospect seems unlikely, however, for it is not economically rational for plaintiffs' attorneys to pursue a multitude of small individual claims.

Employee advocates may also try to marshal public opinion and consumer pressure against companies that restrict employee lawsuits through allegedly "coerced" waivers of the right to take concerted action. Here, too, it seems unlikely that a technical procedural issue can generate the level of public pressure necessary to bring about widespread change.

But in the "me too" era, the area of sexual harassment could prove to be an exception. Some states (e.g., New York) have passed laws that exclude harassment claims from the reach of mandatory arbitration, but can they survive a federal preemption challenge? Some large employers have already voluntarily redrafted their policies to make arbitration of harassment claims optional, and more are expected to follow.

Congressional objection to the *Epic* decision appears unlikely.

Meanwhile, the governor of Washington has issued an executive order directing state agencies to try to contract *only* with companies that do not require employees to waive the right to participate in collective or class actions. If more states were to follow, that could create pressure on corporate bottom lines.

**Arbitration Procedure Details.** The most recent pro-arbitration decisions have only paid lip service to the principle that an arbitration agreement must satisfy general state law requirements for an enforceable contract. In light of *Epic*, employers should expect arbitration agreements to be carefully scrutinized as to whether the text of the agreement or policy was provided or made available to employees, and whether employees were adequately informed as to when their conduct (or silence) would communicate consent to arbitrate. A local example of such analysis is Michigan U.S. District Judge Laurie J. Michelson's post-*Epic* opinion in *Williams v. FCA US LLC*, finding that Chrysler/FCA's communications to employees did not adequately inform them that continuing employment would manifest assent to the company's arbitration policy. Other procedural features of arbitration policies are also likely to be fly-specked, such as: Is there a genuinely unbiased decision-maker, an adequate opportunity for an employee to develop evidence, and available remedies as provided in a governing statute?  ∎

## WRITER'S BLOCK?

You know you've been feeling a need to write a feature article for *Lawnotes*. But the muse is elusive. And you just can't find the perfect topic. You make the excuse that it's the press of other business but in your heart you know it's just writer's block. We can help. On request, we will help you with ideas for article topics, no strings attached, free consultation. Also, we will give you our expert assessment of your ideas, at no charge. No idea is too ridiculous to get assessed. This is how Larry Flynt got started. You have been unpublished too long. Contact *Lawnotes* editor Stuart M. Israel at Legghio & Israel, P.C., 306 South Washington, Suite 600, Royal Oak, Michigan 48067 or (248) 398-5900 or israel@legghioisrael.com.

# Exhibit 5

Miller Canfield to receive this honor, joining Carl von Ende, Saul Green, and Tom Cranmer. The Chapter congratulates Gerald Gleeson on this remarkable achievement and looks forward to the next year of events and camaraderie!



*Women Helping Women Attendees.*
*Photo by Mindy Herrmann*
*Executive Director, Eastern District of Michigan Bar Association*

## Women Helping Women Event Kicks off the Women's Series

### By Hannah Smith

EDMIBAR is excited to announce the new Women's Committee! On January 22, the Women's Committee kicked off with its first event in the Women's Series. The first-of-its kind event was geared toward female lawyers in federal practice, focusing on issues relevant to women lawyers.

The event included a panel discussion on business development and being a rainmaker in the industry. The Hon. Laurie Michelson, District Judge in the Eastern District of Michigan, Jennifer Grieco, Altior Law, Liz Hardy Kienbaum Hardy Viviano Pelton and Forrest, and Megan Norris, Miller Canfield, provided career advice, shared their own trials and tribulations, and discussed helpful strategies to grow and maintain a book of business. In a time when building your brand as a professional is of the utmost importance, these women generously shared their success strategies.

The Women's Committee is working to support female practitioners in their personal, professional, and networking goals. When women support each other and rise through the ranks, they make space for others to follow. In a legal profession that can still be isolating for women, the Women's Committee sets out to create an inclusive and welcoming space for practicing attorneys of all experience levels. Join the Women's Committee at

## Calendar of Events

**July 15**
**Appeals Committee Event**
**12:00 pm – 1:00 pm**
**MEMBERS: $0**
**NON-MEMBERS/GUESTS: $15**

**"At the Podium: Arguing Before the Supreme Court,"** hosted by the Appeals Committee.

This special event features an engaging discussion with Victoria Ferres of Fletcher, Fealko, Shoudy & Francis; Aaron Lindstrom of Barnes & Thornburg; and Christian Grostic, an Assistant Federal Public Defender in the Northern District of Ohio. All three have argued before the U.S. Supreme Court and will share their experiences, preparation strategies, and insights into effective advocacy at the highest level—both in civil and criminal cases. Don't miss this unique opportunity to hear firsthand from seasoned advocates at the nation's highest court.

**August 6**
**Bench-Bar Golf Outing**
**9:30 am – 4:30 pm**

Join our bench and bar for this cherished annual event! Sign up early and save! Larger firms encouraged to bring (2) foursomes with the second foursome being heavily discounted (lawyers from the same firm). Online payment is available, though check(s) preferred (plus, sending a check saves you the 3% processing fee). Email Mindy Herrmann (mindy@edmibar.org) regarding any questions, or any of our Golf Committee Co-Chairs (Brian King/Bush Seyferth, Katelyn Young/Honigman).

**September 18**
**Book Club Event**
**The Grand Bargain**
**12:00 pm - 1:30 pm**

**October 15**
**State of the Court Luncheon**
**12:00 pm – 1:00 pm**

**Local updates and further developments at www.edmibar.org and national chapter updates at www.fbamich.org Log-in with your user name and password FIRST in order to save time and obtain Member pricing**

its next event focusing on "How to Survive and Thrive in an Uncivil Landscape." This topic arose from discussions during the first event where, unfortunately, the lack of civility in the practice of law was mentioned as one of the most dissatisfying aspects of many women's careers in the law. The event will take place on May 21, from 4:30 pm - 7:30 pm at Kerr Russell.

**Eastern District of Michigan**
**Bar Association**
P.O. Box 45
Northville, MI 48167

PRSRT STD
US POSTAGE
PAID
Permit #6067
Detroit, MI

**Executive Director**

Melinda Herrmann
Phone:  (248) 231-7887
fbamich@fbamich.org



## Newsletter Committee:

Zainab H. Sabbagh Co-Editor in Chief
Warner Norcross + Judd LLP
(248) 784-5169

Jessica Lefort Co-Editor in Chief
University of Michigan Law School
(734) 647-4036

Michael Hale
Clairmont Advisors, LLC
(248) 321-8974

Nhan Ho
Assistant U.S. Attorney
(313) 226-9100

David Mellem
Career Clerk to Hon. Kimberly G. Altman
(313) 234-5205

Hannah Smith
Lakeshore Legal Aid
(586) 510-1814

Susan Pinkowski
Case Manager to Hon. David M. Lawson
(313) 234-2662

# Exhibit 6



# FBAnewsletter

Summer 2011

**Federal Bar Association - Eastern District of Michigan Chapter - 53 years of service to our Federal Bench and Bar**

## Annual Dinner at Ford Field - Woodard Honored with Civility Award

On June 9th, the Annual Dinner was held in the banquet facilities at Ford Field for the first time. The venue was an exciting location for the Chapter to once again honor the judicial officers and raise funds to benefit the Federal Bar Foundation.

Out-going President and Magistrate Judge Laurie Michelson presided over the Chapter's official business for the evening. The Chapter elected the proposed slate of officers and board members. Magistrate Judge Michelson then handed off leadership of the Chapter to Michael Riordan. Magistrate Judge Michelson was thanked for her leadership of the Chapter and accomplishments over the past year, and she received a plaque in honor of her service. As has become tradition, Executive Director Brian Figot also presented Magistrate Judge Michelson with numerous used books for her to read during her free time now that she is no longer the Chapter president.

The Chapter then honored two members of the bench who recently retired. First, the Chapter recognized the service to the Chapter and bench of Magistrate Judge Virginia Morgan. Sam Damren, a partner at Dykema Gossett, and long-time friend of Magistrate Judge Morgan, highlighted her impressive and varied legal career before presenting her with a plaque honoring her accomplishments.

The Chapter then recognized Judge Anna Diggs Taylor for her

### INSIDE THIS ISSUE

Magistrate Judge Michelson Sworn In                      pg. 3-4

In Memoriam Judge Feikens                                pg. 5-7

Dave Weaver                                              pg. 7

Portrait for Judge Zatkoff                               pg. 8-9

**Special** Photos at Annual Dinner, Gilman and Portrait Ceremonies                      pg. 10-11

Portrait for Judge Cohn                                  pg. 12-13

Past Presidents Lunch                                    pg. 13-14

Gilman Luncheon                                          pg. 14

Bench-Bar Conference                                     pg. 15

Law Day 2011                                             pg.16,18

Law School Motion Day - Year In Review                   pg. 18

Calendar of Events                                       pg. 19

(continued on page 3)



## President's Column
### Laurie Michelson

**"Media and the Law" Lessons Learned From The Bench-Bar Conference**

Maybe it's fortuitous, or coincidence, or we really did select a timely topic. But there have been many recent events involving the precise issues discussed at our "Media and the Law" Bench-Bar Conference in April.

The first panel provided insights on navigating a high profile trial. So much of what they talked about is being played out in the Dominique Strauss-Kahn case – the former IMF chair charged with sexually assaulting a hotel maid. We learned at the Conference that the authorities did not allow Martha Stewart to turn herself in because they probably wanted to subject her to the "perp walk" -- the "walk of shame" into the courthouse where the handcuffed defendant looks anything but innocent as the media scrambles to take his/her picture. The Strauss-Kahn perp walk was particularly controversial, with increased agitation in Strauss-Kahn's native France because French law bars the media from showing suspects in handcuffs before they are convicted.

Moreover, because the Strauss-Kahn case is in state court, cameras are allowed in the courtroom. It is difficult to deny the additional emotional impact from actually seeing one of the world's most powerful men looking haggard and unkempt, sitting amongst some of New York's petty criminals while the prosecutor gives the lurid details of the underlying offense.

But as our panelists discussed, criminal proceedings have become a form of entertainment. They explained that the media focuses on scandals and the negatives because that is what the public prefers to read and watch. So whether you favor Anderson Cooper,

**WINNER 8 YEARS** National FBA Outstanding Newsletter Award

(continued on page 2)

# President's Column (continued)

Bill O'Reilly, Jon Stewart or Greta Van Susteren, there was no shortage of "legal analysts" and prosecutors and defense lawyers pontificating about this case. And very little of it bore any relationship to the fundamental concept underlying our criminal justice system: innocent until proven guilty. The city of New York was merciless. Its tabloids ran photographs of Strauss-Kahn with headlines like: New York Post: "Sleazy Money" and New York Daily News: "Le Perv." Respected New York Times columnist Maureen Dowd wrote an op-ed piece shortly after Straus-Kahn's arrest that began as follows: "Oh, she wanted it. She wanted it bad. That's what every hard-working, God-fearing, young widow who breaks her back doing menial labor at a Times Square hotel to support her teenage daughter, justify her immigration status and take advantage of the opportunities in America wants — a crazed, rutting, wrinkly old satyr charging naked out of a bathroom, lunging at her and dragging her around the room, caveman-style." And even Mayor Bloomberg was quoted as saying, "If you don't want to do the perp walk, don't do the crime." So now think about the direct application of the question Bob Morvillo posed in the video shown during the Conference: "Is there anyone in this room who thinks that [Dominique Strauss-Kahn] is innocent?"

During the Conference, the panelists also talked about the impact of social media. So it was not surprising when Channel 7 did a recent news story about a former Macomb County Commissioner, Carey Torrice – who TMZ previously declared one of America's "hottest politicians" – and her unfortunate passion for social media. Back in 2009, Torrice and her husband were convicted of conspiring to burn down their Chesterfield Township home. They are apparently on the hook for thousands of dollars that they have not paid to the insurance company. So the insurance company went on the offensive. According to the news report, a lawyer for the insurance company provided the court with documentation from Facebook and Twitter posts that suggested the Torrices are living a very comfortable lifestyle. Ms. Torrice apparently posted and tweeted about her lavish shopping sprees and purchases of luxury items. This contributed to the judge's decision to appoint a receiver.

Our luncheon speaker, Chris Hansen, talked about the success of "To Catch a Predator." Like the high-profile criminal trial, hidden camera investigations and "gotcha" journalism are good entertainment and popular with the public. And sometimes they yield positive results – like the convictions of many of the men Hansen confronted. Similarly, is there much doubt that after the news media secretly videotapes a judge over the course of several weeks, collecting footage of the judge leaving home late, having long, leisurely lunches and shopping instead of being at the courthouse – that for at least a few months after that news story airs, the judge will be on time for oral argument and in her chambers for full days regardless of whether the news report accurately portrays the judge's work ethic or productivity?

Another recent event that captivated us was the killing of Osama Bin Laden by an elite team of Navy Seals. There was some discussion about whether Bin Laden should have been captured as opposed to killed since he may have been unarmed at the time of the attack. That would have been the ultimate in high-profile cases. And what would have been the reaction to any lawyer who dared to represent Bin Laden? Interestingly, Ike Sorkin, one of the Conference panelists, explained that he received much more "hate mail" over his representation of Bernie Madoff than he ever did representing Syrian arms dealer Monzer Al-Kassar. We will never know if Bin Laden's counsel would have received emails like the following sent to Sorkin: "Dear lowlife: you really are the lowest form of humanity representing this criminal . . . . I hope your career is ruined. I'm sure you sleep well at night while others are in so much pain;" and "for defending the Madoff case you should be MURDERED or suffer to die in humiliation or possibly (but it would not be soon enough) you should suffer drastically from a serious illness for a number of years and then die."

The Bench-Bar Conference was just one of many events this year that gave us much to ponder. Think back to the State of the Court Lunch in September, when Chief Judge Rosen talked about the decaying nature of our Federal Courthouse. And the Criminal Law Committee's panel discussion on the death penalty where we learned how those cases get brought by the U.S. Attorney's Office and the specialization required to adequately defend such a case. And Dean Erwin Chemerinsky providing a flavor of what the Roberts' Court might look like for the next 30 years. And the "Celebrating our Diversity" event, focusing attention upon the fact that the legal profession is second to last in minority representation. And Governor Snyder asking us to all work together to help redefine our great state of Michigan.

Thank you to the Court, the FBA Officers, Board, Committee Chairs, Executive Director and members for making all of these events possible and for another wonderful year.

## Annual Dinner *(from page 1)*

lifetime of public service. While Judge Taylor was unable to attend the event, AUSA Michael C. Leibson spoke, noting the fitting words on the plaque given to her by the Chapter, which included "a true pioneer in public and private practice."

Next, the Chapter awarded the Julian Abele Cook, Jr.- Bernard A Friedman FBA Civility Award. This year's recipient was AUSA William Woodard. Geneva Halliday, a past president of the Chapter and former colleague of Woodard at the U.S. Attorney's office, introduced him and presented the award. Woodard has worked in the Defensive Litigation Unit of the U.S. Attorney's office since 1989 as a trial attorney and supervisor. He specializes in defending federal law enforcement officers. Previously, Woodard worked at the City of Detroit Law Department and the Federal Defender Office in Detroit.



*Pamela Renusch, Jim Michelson, Magistrate Judge Michelson, Elisa Angeli Palizzi and Dave DuMouchel.*

As an example of the type of lawyer Woodard is, one of his adversaries in a past case had this to say to say about him: "Bill Woodard crushed me in our case together, but he was very courteous when he was doing it. I can't think of a more deserving honoree." The Chapter congratulates Bill Woodard on his accomplishments.

The evening concluded with entertainment provided by *A (Habeas) Chorus Line*. Special thanks go to Annual Dinner co-chairs David Grand, Caridad Pastor Cardinale, and George Donnini for making the event a great success.

## Laurie Michelson Sworn In as U.S. Magistrate Judge

On February 22, 2011, Chapter President Laurie Michelson was sworn in as a U.S. Magistrate Judge for the Eastern District of Michigan. Her Investiture was held on March 31, 2011, in the Special Proceedings Courtroom of the Courthouse, with Chief Judge Gerald E. Rosen presiding and serving as master of ceremonies.

Judge Michelson's Investiture was a family affair, as she was welcomed to the Court family with the assistance of her parents, siblings, nephews and nieces, and joined by her professional and FBA families.

Chief Judge Rosen introduced the judges in attendance and then shared some of the comments made to investigators during Judge Michelson's background investigation, confiding to the audience that Judge Michelson was revealed to be incredibly hard working, meticulous, a very generous person, unsparing in her thoughtfulness of others, and had excellent skills as an attorney.

The formal proceedings then opened with her niece, Rebecca Michelson, playing the National Anthem on the saxophone. Judge Michelson's nephew, Connor Renusch, assisted U.S. Circuit Court Judge Cornelia G. Kennedy (for whom Judge Michelson clerked as a new lawyer) in administering the oath.

Judge Kennedy described Laurie as an excellent clerk who demonstrated great care for others; sharing, in particular, an anecdote about Judge Michelson's dedication to the plight of a law student with Kenyan citizenship upon learning, just prior to the student assuming his clerkship for Judge Kennedy, that federal law clerks had to be U.S. citizens. Judge Michelson dedicated herself to researching whether the student could clerk and /or obtain U.S. citizenship.

After taking the oath, Judge Michelson's nieces and nephew, Rebecca Michelson, Brooke Michelson and Connor Renusch, presented her judicial robe.

The Chapter's Immediate Past President Elisa Angeli Palizzi spoke on behalf of Judge Michelson's FBA family, noting Michelson's humble personality and sharp intellect. Michelson received a bachelor's degree from the University of Michigan in 1989; her law degree from Northwestern University School of Law in 1992; and, after clerking for Judge Kennedy, joined Butzel Long where she earned an outstanding legal reputation. Palizzi described Michelson's tremendous leadership of the Chapter as its president for the past year, noting in particular Judge Michelson's work in establishing the vibrant Law Clerk Committee, in planning the outstanding Bench-Bar Conference held in May, and in leading over 14 events in only the last six months of her tenure as president.

*(continued on page 4)*

## Judge Michelson *(from page 3)*

Judge Michelson's sister, Pamela Renusch, entertained attendees with the humorous anecdotes, heartfelt sentiments and personal insights that can only come from one's identical twin. Renusch described Judge Michelson as her better half and "a truly good person," who is tough, but fair, just, and honest. Renusch listed Judge Michelson's prior titles as a basketball and softball athlete, including "Team Captain," "Team MVP," and "All American," and her current golf title for three years running of "Club Champion" at Franklin Hills Country Club.

Judge Michelson's mentor Dave DuMouchel spoke on behalf of her Butzel Long family. DuMouchel discussed how Judge Michelson was a "star in every respect" at the firm -- consistently working among the longest hours, producing excellent work and contributing to the firm's management. Candidly, he admitted that others have observed that he may have to "come out of retirement" and "get back to work" upon losing his "right hand." After establishing a reputation in general civil and intellectual property litigation, he recounted how Michelson had come to work with him, focusing on white collar criminal defense, including defense of lawyers and judges in professional licensure cases, and representation of parties against securities fraud and health care charges. DuMouchel described Judge Michelson as outgoing, ever positive and optimistic (in contrast to himself, he added) and a consummate team player who will be missed by her clients and colleagues. Finally, he recalled Judge Michelson expressing great admiration and respect for Judge Kennedy, who helped to shape Judge Michelson's understanding of what a judge should be.

It was evident from the remarks of Jim Michelson, Judge Michelson's father, that she inherited his great sense of humor. Between the humorous anecdotes and comments, however, the audience also heard Judge Michelson's father reminisce on her life, and the strong work ethic, commitment and dedication to excellence that led to her many accomplishments. Her position on the federal bench, he added, fulfilled a lifelong ambition. Mr. Michelson noted proudly that Judge Michelson takes her responsibilities seriously, while not taking herself too seriously -- a point amply illustrated when Judge Michelson was given her chance at rebuttal and responded in kind to the presentations with her own wit, insights and wisdom.

Judge Michelson began by thanking the speakers, Chief Judge Rosen, Judge Kennedy, the Eastern District Bench, the Chapter, her family, friends and colleagues, and the merit selection committee. Judge Michelson explained that while her entire family chose a career in advertising with Simons, Michelson, Zieve, Inc., she was more interested in the intellectual property rights behind the products being advertised and instead joined Butzel Long, where she felt privileged to practice for 17 years. She introduced her law clerks Charlotte Carne, who is an experienced labor lawyer, and Eric Lee, who recently clerked for U.S. District Judge John Feikens and has practiced intellectual property law. Michelson expressed that she felt great responsibility in joining the federal bench. She was obviously anxious to begin her duties as a magistrate judge, and expressed the hope that she may perform those duties promptly and fairly, with wisdom, consideration and impartiality.

The Chapter is proud and delighted for its President and now U.S. Magistrate Judge Laurie J. Michelson. Congratulations!



## HANSON RENAISSANCE
### Court Reporters & Video

Service • Tradition • Quality • Technology

- Free Online File Repository
- Expert Witness Transcript Database
- Convenient Services
- Attention to Accuracy
- Staying Ahead Using Technology
- The Finest Court Reporting Talent

## Locations

Detroit* • Ann Arbor* • Troy*
Bloomfield Hills • Mt. Clemens
• Novi* • Livonia*

* Videoconferencing Available

Hanson Renaissance
Court Reporting & Video Services,
*Setting the standard since 1963*

888-800-0876
www.hansonreporting.com

# In Memoriam
# Judge John Feikens

*On May 15, 2011, Judge John Feikens passed away at his home at the age of 93. Judge Feikens was permanently appointed as a district judge in December 1970. In October 1960, he received an interim appointment, but relinquished the bench to return to private practice. Judge Feikens served as Chief Judge from 1979 to 1986, after which he assumed senior status.*

*He received a B.A. from Calvin College in 1938 and a J.D. from the University of Michigan in 1941. He was a fellow of the American College of Trial Lawyers, and received an honorary Doctor of Laws degree from the University of Detroit in 1979 and from the Detroit College of Law in 1981.*

*Printed below is Chief Judge Gerald E. Rosen's Eulogy for Judge Feikens, which captures in perfect detail the life and legal career of this illustrious jurist.*



*Judge John Feikens*

"John Feikens was a man of family and a man of institutions that he treated as family. I am here today to speak for one of those families, his Court family of more than forty years. All of us who have had the great privilege and good fortune to be bathed in the warm glow of John's friendship know well that over his many years, he was many things at many times to many people. This was because John was a man with a great heart and a deep commitment to those people and institutions that were so much a part of his life. And, as we all know, when John Feikens became a part of something, he did it fully and completely, with no half-hearted measures. In today's sports vernacular, John Feikens never just "mailed it in" -- in his long life, he gave it everything he had and he left nothing out on the court.

To his colleagues during his long and storied tenure, John was a larger-than-life-presence who guided us from our earliest days as Judges with the example of his commitment to justice, compassion for people and devotion to the Court. To say that John was the spiritual leader of the Court captures only some of the regard and esteem his colleagues held for him. In many ways, he was more than that. John was truly the beating heart of the life of our Court, a unique combination of visionary

and play-maker, who not only saw a bright future for the Court, but had the energy, insight, perseverance and finesse to shape it.

I don't think there was ever a day during John's more than four decades on our Bench that he did not wake up and say to himself: "What can I do to make the life of our Court better." John's hopes and dreams for the Court usually manifested themselves in projects large and small. Whether it was his vision of creating the Court's comfortable and welcoming Conference Center which now bears his name, or initiating and seeing to fruition the renaming of our Courthouse for his dear friend and mentor, Judge Theodore Levin, John would pursue these projects with the tenacity, vigor and single-mindedness of a one-man panzer division.

To be sure, in furtherance of his commitment to a project or an idea, John could be stubborn – perhaps even a bit obstinate – and certainly difficult to dissuade from a course of action once he was set upon it. No surprise there, I'm sure, to his friends and family – he was, of course, a Dutchman. But, those of us whom he involved in his projects always recognized that it was precisely this single-minded dedication and determination that allowed him to accomplish so many of the remarkable things that he did in his life.

As a Judge, John's energy, commitment and perseverance found their outlet in his pursuit of what he believed was a just and fair result. John's focus was never on cold, detached legal analysis, but rather on the larger issues of the good of society and our community, and the role a judge could play in deciding those issues. Sometimes this would put him at odds with the parties, and, at times, even his friends on the Court of Appeals. As some of you here today know, John had a generous and capacious view of a Judge's "inherent powers" - - the doctrine of "judicial restraint" did not find a warm embrace in John's judicial approach, particularly when he thought that the cold letter of the law might get in the way of resolving issues in a case in the best way he thought possible.

Much has been written and said about John's epic saga in presiding for almost 35 years over the Detroit Water and Sewer case, and certainly that case will be the headline of his judicial legacy. No doubt, as many have observed, his approach to managing the case – and the determination with which he pursued his objectives *(continued on page 6)*

## Judge Feikens *(from page 5)*

– were, shall we say, unorthodox and creative. And some disagreed with John's robust approach, including various parties at various times. However, I could not help but notice that in the news reports and commentary this week, even those who had opposed some of the more creative things that he did in the case, ultimately gave John great credit for deftly steering that very difficult case through the shoals of controversy and division to the bright uplands of a stable system that now provides high quality water and sewage treatment to our greater metropolitan community.

Many have asked why John had such a long-standing passion for this case – which after all involved water and sludge. I think that at bottom, John was driven by his great desire, evident throughout his life, to bring people together toward a common good, and in this case, John consistently and persistently worked tirelessly to bring together the City of Detroit and its suburbs. And, who would gainsay that in this long, complicated case that presented such a myriad of complex legal, political and environmental issues – not to mention personalities – John didn't work miracles. Agree with him, or not, I can assure you of this: whether in the water case or in his many other cases great and small, John's focus was always dead center upon using his judicial authority for the betterment of our community and our society - - and our community and society is much better off for having had the benefit of John Feikens' judicial tenure.

But, beyond his professional life and remarkable record of achievement, what I loved most about John was his fundamental humanity, because underlying his dedication and perseverance was a compassion for people, and particularly for his family, friends and colleagues. When I was a young lawyer and John was the Chief Judge of the Court, I thought that he was an almost forbidding figure - - when he came through the door into that beautiful, historic almost Church-like Courtroom where his portrait now hangs, I thought God himself had descended into our midst. But, when I joined the Bench, as a very young and inexperienced Judge, John could not have been a warmer friend and colleague, always making time for me for advice and consultation, and always with wisdom, insight and good humor.

In ancient cultures and tribes, the history and traditions of the society were passed down from older generation to younger generation by story telling, often while gathered around a fire. And so it is with our little tribe of Judges. Perhaps no one in the history of our Court was ever a better or more assiduous and affectionate teller of the stories of our history and traditions than John. As I think about the many things about John I treasure, it's some of these small, intimate moments that stand out. John relished talking about the Court and its people. We didn't have a fire, but for warmth, some of us would gather around a bottle of Scotch, and John would regale us with stories of our past.

It wasn't always about history that John wanted to talk, though. When he would call late on a Friday afternoon at the end of a long week, and say with his inimitable chuckle, "Let's have a snort. I'd like to seek your advice about something", I knew that not only was this was my cue to break out the good Scotch, but, as I learned over time, this was usually a prelude to recruiting me into one of his "projects." And then, when he really wanted to make his case for a project by sharing a confidence, he would preface it by saying, "What I am about to tell you now, Jerry, is within the bosom of our friendship." Of course, when John would approach you this way, it was very hard to say "no" to him.

When I think about the pleasure of John's company, I am reminded of Winston Churchill's wonderful description of the enjoyment he felt in the company of his great friend Franklin Roosevelt. Churchill said, "With all of his buoyant sparkle and his iridescence, being in Franklin's company is like opening your first bottle of champagne."

All institutions bear the stamp of the men and women who have served in them, and are the sum of the different parts each of those men and women contribute – and that is certainly true of our Court. But John Feikens has done more than simply leave an imprint on the Court. He has been one of its greatest leaders. In things large and small, it is hard to look at any area of our Court life and not see the fruits of John's creative ideas and persistent devotion to our Court. Even in his last years, rather than reducing his commitments and winding down, he continued to dedicate himself to making the future of our Court and its work more secure and rewarding for his colleagues and our staff. His legacy of commitment and devotion to our Court will inspire generations of Judges and lawyers for years to come.

It's hard to know how to end a farewell like this -- and maybe that is because we don't want it to end – but I thought that given how much John has meant to so many of us over so many years, I'd close by sharing a few verses from W. H. Auden's work "Stop All The Clocks". With apologies to Mr. Auden's memory, both for my ineloquent delivery and because I have taken some poetic license and paraphrased his poem to fit our circumstances:

Stop all the clocks, cut off the telephone,
Prevent the dog from barking with a juicy bone,
Silence the pianos and with muffled drum
Bring out the coffin, let the mourners come.

Let the aeroplanes circle moaning overhead
Scribbling on the sky the message "He is Dead",
Put crepe bows round the white necks of the
    public doves,
Let the traffic policemen wear black cotton gloves.

He was our North, our South, our East and West,
Our working week and our Sunday rest,
Our noon, our midnight, our talk, our song,
We thought he would go on forever;
    we were wrong.

Speaking for your Court family, John, good-bye dear friend, and thank you for the pleasure of your company these many years. May God speed you on to your next project."



### From Court Administrator Dave Weaver

**Technology Brings Changes to the Clerk's Office**

Since the implementation of the Case Management/Electronic Case Files (CM/ECF) system, the traditional functions of the Clerk's Office have changed dramatically. One of the most notable changes is the reduction in public traffic to our Clerk's Offices at each Court location in the district. We have found that public traffic in our Ann Arbor Clerk's Office has diminished to the point that I have recommended and the Bench has approved closing that office to the public. The judicial officers and Court functions in Ann Arbor will be fully supported. However, the cost of maintaining a public office where there is virtually no public traffic could not be supported. Beginning on July 11, 2011, the Ann Arbor Clerk's Office will be open to the public only on Tuesdays and Thursdays from 8:30 a.m. to 4:30 p.m. Effective September 6, 2011, public hours will be discontinued. Chambers and other Court agencies will remain open and individual jurors will report to the second floor juror assembly room when called.

**Update on Divisional Boundary**

In my last article, I reported on a proposal being considered by the Bench to eliminate the North/South divisional boundary line in the District. Doing so would provide the Court with maximum flexibility in balancing the caseload in the District and eliminate opportunities for judge shopping. The Court met with stakeholders that would be affected by the proposal and received many other thoughtful written comments. The Bench will likely take up final consideration of the proposal over the Summer. If it is approved by the Bench, the proposal would then be presented for approvals from both the Sixth Circuit Judicial Council and the Judicial Conference of the United States. Ultimately, Congress would have to approve an amendment to 28 U.S.C. § 102. This is the statute that establishes the two divisions within the District and lists the names of counties included within each division.

**Judicial Vacancies**

As of this writing, the Court continues to have two vacant district judge positions and one vacant magistrate judge position. While a new magistrate judge should be on board in the Fall, the status and timing for filling the district court judgeships is not currently clear.

As always, questions and/or comments may be sent via email to me at david_weaver@mied.uscourts.gov.



**Your life is always in**

# MOTION

THE DEFENDER
LAWYER RETURNS TO HIS AUTO ROOTS

'CSI EFFECT'
TOUGH JURORS EXPECT
CSI FORENSIC PROOF

WINGING IT
BIRDERS FLOCK TO NATURE SITES

**Make**
**MOTION**
***Your* Legal
Lifestyle Magazine.
Subscribe Today
and Don't Miss
An Issue!**

**Call 248-577-6100**

# Portrait Dedication Ceremony for Judge Zatkoff
### By: Jim Carroll*

On Friday, June 10th, at 11:00 a.m., the Court met in special session for the presentation of Judge Lawrence P. Zatkoff's portrait. The ceremony, scheduled to coincide with Judge Zatkoff's twenty-fifth anniversary on the Court, was attended by his wife Kelly; daughters Catherine and Lizzie, and son Joe; as well as numerous family friends and members of his staff, including most of his former law clerks, and many of his colleagues on the Court.

Chief Judge Gerald E. Rosen presided over the intimate ceremony which opened with the Pledge of Allegiance. After noting some of Judge Zatkoff's career achievements, intellect, leadership of the Court and (very) dry sense of humor, Chief Judge Rosen introduced Robert Biskup, the Judge's first law clerk, to speak on behalf of all twenty-six law clerks who have worked for him. Rob had asked each law clerk to provide a single word to describe the Judge. They submitted the following words: steady, thoughtful, honorable, wry, mischievous, entertaining, scrutinizing, captain, brave, unwavering, dedicated, leader and, finally, wise, the single word Rob chose.

In explaining why he chose the word "wise" to describe Judge Zatkoff, Rob noted that wisdom is not simply intelligence or knowledge, but rather the combination of those two ideals together, put to good use. He stated that wisdom is difficult to attain, even more difficult to live day-in-and-day-out, and a gift not shared by all. In closing, on behalf of the Judge's law clerks, Rob conveyed what they see in him: "a wise teacher, a wise mentor, and a friend."

Judge Bernard A. Friedman, in the roles of colleague and friend, began by presenting Judge Zatkoff a white wig (an allusion to that period when he sat by invitation on the Royal Court in England), which he (has not) promised he will wear while presiding in Port Huron. Judge Friedman read a list of words or characteristics he associates with Judge Zatkoff including: friend, mentor, patriot, guts, father, hobbies, judge, funny, grandfather, knowledge, cares, calls, shares, style, class, laughs, smiles, analyze, reads, Kelly, loyal, remembers where he came from, thoughtful, flowers and leader.

Judge Friedman recalled how, about a week after he began working at the Courthouse, Judge Zatkoff came to his chambers with a "big smile," a "bagful of headache remedies," and a bench book that was invaluable for a new Federal Judge – a bench book Judge Zatkoff presented to many other colleagues when he or she joined the Court. Judge Friedman described Judge Zatkoff as available, willing to listen, non-judgmental and helpful in that he always tried to reach a conclusion. He further described him as calming, a friend in good times and bad, someone who knows how to take a situation and pull all the pieces together--whether it be in court or a Judges' Meeting--someone who has a sense of humor that touches everyone, and a person who boosts you up when you are down and flies with you when you are high.

Judge Friedman extolled Judge Zatkoff's leadership qualities, particularly while Chief Judge of the Eastern District from January 1, 1999, to June 16, 2004. Among other things, Judge Zatkoff: provided leadership for the program that led to paperless filings; initiated procedures for cost-containment within the Court; fostered development of a professional purchasing department for the Court; was responsible for the restoration of the historical Chief Judge's courtroom to its original beauty and luster; recognized the importance of the Federal Bar Association and supported Court funding to finance some of its important programs; brought congeniality and consensus to the Bench; and was the force behind the construction of the high security and ceremonial courtroom in which the Portrait Ceremony was held, a big asset to the Eastern District. In closing, Judge Friedman expressed that Judge Zatkoff is a true leader, mentor and a friend, a giant of a human being and a giant of a judge.

Michigan Supreme Court Justice Brian Zahra, Judge Zatkoff's third law clerk, recounted several memories and valuable life lessons he experienced while working for the Judge:

• a tour of the Air Force Museum in Dayton, Ohio, after a Court of Appeals sitting in Cincinnati – examples of two of the many work and/or educational field trips that the Judge regularly affords his law clerks;

• working late into the night on the tax evasion trial of *U.S. v. Elbert Hatchett*;

• traveling with the Judge to the Warren City Hall to observe the Christmas display that was challenged by the ACLU; and

• sitting in front of Judge Zatkoff in the bench trial of *Sediaglu v. Chrysler Corporation* - a breach of contract action brought against Chrysler by two Turkish businessmen who bargained for the exclusive right to sell the Chrysler Snow-Runner in Turkey and then sold this product, intended for use in the snow, to the Turkish military for use in the desert, where sand clogged the gears and engine.

Justice Zahra mentioned a gift the law clerks prepared and presented to the Judge before the ceremony

consisting of letters from each law clerk describing the impact that the Judge had on his career and/or life.

The last speaker was Judge Zatkoff's daughter, Catherine Lewis, who spoke on behalf of her family about the Judge as a dad and as an individual. Catherine offered a unique perspective of her father's patriotism and entertained the audience with a tale of his affinity for blaring music such as "The Stars and Stripes Forever" early on Saturday mornings. The music would cause the windows to rattle and rouse his kids out of bed and bring them bounding downstairs. There, the Judge, as commanding officer, would order the kids to fall into line and then lead them in a march around the house. In doing so, he expressed the importance of love of this country in a magical way for the kids.



*Judge Lawrence P. Zatkoff at his portrait dedication ceremony. Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.*

Catherine related what it was like to observe and participate in her Dad's campaign for U.S. Congress in 1976, including the sacrifices and disappointments during that campaign. She spoke of his extensive efforts on behalf of Governor William G. Milliken and the Republican Party in the mid-to-late 1970s.

Catherine said she was especially proud of her father's efforts in helping locate and bring home the remains of Major Robert Tucci, a fighter pilot from Fraser, whose plane crashed in Vietnam in 1969 and who remained missing-in-action until 2002. When serving as a Roseville City Attorney, Judge Zatkoff had became involved in the search for Tucci by providing legal help to Tucci's family. Among other things, he had traveled to the Vietnamese embassy in Paris seeking answers, with a petition signed by 80,000 U.S. citizens, including that of President Gerald R. Ford.



*Lizzy Fisher, Kelly Zatkoff, Judge Zatkoff, Joe Zatkoff, and Catherine Lewis. Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.*

In conclusion, Catherine expressed how proud she is of her Dad, who started out as a child of working class parents, worked his way through college and law school, and then embarked on a journey with many twists and turns, maneuvering through them "with great skill, infinite wisdom and tenacity" to become a Federal Judge at age 47. She then addressed her Dad, telling him that he has been her mentor, a man who she holds in the highest esteem and whose ethics, integrity and dedication to the truth she respects on and off the bench.

Following these heartfelt speeches, Kelly Zatkoff and artist Michael Del Priore unveiled the portrait. Chief Judge Rosen accepted the portrait on behalf of the Court.

In his closing remarks, Judge Zatkoff thanked everyone for coming and introduced his family and friends in attendance. He expressed his gratitude for the near-genius ability of Mr. Del Priore to paint such a terrific portrait given the subject with which he had to work. The Judge recognized his law clerks and expressed his appreciation to them for making his life easier by doing the work they had done over the years. He thanked the Federal Bar Association for the contributions it made in connection with the ceremony.

Judge Zatkoff expressed his pride in being a member of the bench of the Eastern District of Michigan, a bench that has a culture and a custom that is very rare. He explained that culture as one that typifies the culture of Detroit, the manufacturing business and the business of getting things done, declaring: "This is a bench that gets things done; they get the job done, all the time, every time." With that, Judge Zatkoff closed by saying, "I am very proud to be a member of this bench . . . Thank you, colleagues, for permitting me to be part of your bench."

Judge Zatkoff's portrait will be hung in the Special Proceedings Courtroom on the first floor, currently used by Judge Friedman.

*\*Jim Carroll is Judge Zatkoff's Career Law Clerk.*

# Annual Dinner

*Photos by John Meiu, courtesy of Detroit Legal News Publishing LLC.*



*Carol Romej and George Donnini.*





*Kimberly and Bill Altman.*

*Susan Gillooly, Saima Mohsin and Matthew Schneider.*



*Magistrate Judge Virginia Morgan, Bill Woodard, Magistrate Judge Laurie Michelson and Michael Riordan.*

*Judge George Caram Steeh, Julie Plawecki, Chief Judge Mark Plawecki, Yvonne Guy and Judge Ralph B. Guy.*





*Judge Lawrence P. Zatkoff and his law clerks at his portrait dedication ceremony.*

*Judicial officers in attend— dedication ceremony. Photo b— Legal News Publishing LLC.*

**10**

## Gilman Luncheon

*Photos by John Meiu, courtesy of Detroit Legal News Publishing LLC.*







*Wayne Pratt and Michael Leibson.*

*Jill Krolikowski and Rodney Ploucha.*

*Lisa Mikalonis and Jason Thompson.*



*Chief Judge Rosen, Governor Snyder and Magistrate Judge Michelson.*



*...ance at Judge Cohn's portrait ...y John Meiu, courtesy of Detroit*

*Judge Avern Cohn and his law clerks and staff at his portrait dedication ceremony.*

# Portrait Dedication Ceremony for Judge Cohn
### By: Andrew S. Doctoroff*

Mothballed in the Courthouse basement for more than a decade, the portrait gathered dust, abandoned.

Its subject, a singular jurist on whom the spotlight still frequently shines, neither wanted nor needed additional attention.

But forces -- his wife, the chief judge, the artist himself -- prevailed upon him to relent, which, uncharacteristically, he did.

And so, on May 19th, hundreds of people -- those whom he has touched, those who have been the objects of his affection, admiration and agitation -- assembled on the Courthouse's first floor to witness the unveiling of the portrait of Judge Avern Cohn, which was painted by Birmingham artist Glen Michaels. The unveiling took place during a special session of the Court.



*Judge Paul D. Borman at Judge Cohn's portrait dedication ceremony. Photo by John Meiu, courtesy of Detroit Legal News Publishing*

The rendering captures the essence of Judge Cohn. It portrays him wearing his robe, sitting at a mahogany trestle desk in a dark-toned library, which serves as the background. Viewers' eyes gravitate to the painting's two islands of light -- Judge Cohn's face and an open book that he is studying. His expression is pensive, somewhat stern; he is staring at his audience, seemingly admonishing us for intruding upon his deliberations.

Throughout the ceremony, Judge Cohn was flanked by 30 of his judicial colleagues -- District Judges, Bankruptcy Judges, Magistrate Judges and Sixth Circuit Court of Appeals Judges, all of whom attended to pay tribute to the honoree's 32-year career



*Lois Pincus Cohn, Judge Avern Cohn, and portrait artist Glen Michaels. Photo by John Meiu, courtesy of Detroit Legal News Publishing*

on the bench. On this day, ideology was irrelevant, a fact underscored by the presence of Michigan Supreme Court Chief Justice Robert P. Young, Jr.

In his remarks following the unveiling, Judge Cohn addressed Chief Justice Young, saying, "It's especially pleasing to see you here today. It certainly means that we know how to disagree without being disagreeable."

The special session, over which Chief Judge Gerald E. Rosen presided, moved briskly. In addition to Chief Judge Rosen, four people closest to Judge Cohn offered honest testimonial and praise: Judge Paul D. Borman (in whose courtroom the portrait of Judge Cohn will hang); Eugene Driker, a founding member of Barris, Sott, Denn & Driker; Julie Owens, Judge Cohn's case manager; and Lois Cohn, Judge Cohn's wife.

The ceremony was refreshingly, and lovingly, candid. Because his place in Michigan's judicial history is so firmly established, because he is so widely held in high esteem, because he is not one to stand on ceremony or assume imperious airs, the speakers presumably felt free to tweak Judge Cohn, which they did -- about his being a prolific author of epistles that appear in the media, about his rumored immoderation.

Collectively, those paying tribute to Judge Cohn drew a profile of a remarkable man -- someone fiercely committed to the law, his family, his faith and his community, someone defined by his preternatural vigor and intellectual curiosity.

"His portrait should have the [Detroit Institute of Arts'] Rodin sculpture of 'The Thinker' alongside him," Judge Borman said of Judge Cohn. "He likes complex cases. He thrives on intellectual challenges[.] . . . He reads while we are

(continued on page 14)

sleeping and the next morning calls up and says, 'Have you seen this yet?!'"

In words that rang true, Driker explained Judge Cohn's unflagging ebullience by quoting the author, Pearl Buck, who observed, "To find joy in work is to discover the fountain of youth."

"Avern," Driker added, "has relished in the joy of his work and that has kept him youthful in intellect, interest and intensity."

Owens made the audience convulse with laughter as she gave an insider's account of the workings of Judge Cohn's chambers, particularly when she affirmed that his "favorite story to tell the attorneys is one about the boy, a pony and a pile of manure."

Judge Cohn's remarks were brief.

Judge Cohn allayed any concerns about the fact that his gaze will forever be fixed on Judge Borman. "Paul should understand that there's no way I can talk to him from that wall."

And, then, after offering sincere thanks to his family, staff and law clerks, he concluded by saying, "This is a grand day for me as a judge. It is second only to a day in late May, 1978 when I received a phone call from Senator Donald Riegle who said to me as I picked up the phone, I want you to go on the bench, Avern."

Following the ceremony, guests attended a reception in Room 115 where they were served some of Judge Cohn's favorite foods, including coney dogs from Lafayette Coney Island (the only real place for coneys, per Judge Cohn's oft-issued injunction).

On this day, large floral arrangements adorned the entire first floor of the courthouse, including Room 115. Judge Cohn's current and former staff and law clerks provided the flowers.

That seventeen of Judge Cohn's former law clerks attended the unveiling (one traveled from Japan to Michigan) spoke volumes about their strong fondness for the man and the impact he has had on their lives.

The unveiling was tinged with a bittersweetness, because it fell on the same day on which the memorial service for the venerable Judge John Feikens took place. The juxtaposition of the two ceremonies underscored in many peoples' minds that we are lucky to have a giant walking among us.

*Andrew S. Doctoroff is a former law clerk to Judge Avern Cohn (1990-1992) and a partner at Honigman, Miller, Schwartz & Cohn.*

## Past Presidents' Luncheon

The date was May 10th, the setting was the Detroit Athletic Club, and the attendees included the past presidents, current officers, and Board member, Newsletter Co-Chair and nominated Program Chair, Kimberly Altman. Led by our outstanding President, Honorable Laurie J. Michelson, the group reviewed the year's outstanding Chapter accomplishments and approved the impressive proposed slate of officers and Board members to be voted upon by the general membership at the Annual Meeting.

Highlighted events included the luncheon program that now boasts 33 sponsors and a sold out venue at the Westin Book Cadillac that literally required Program Chair, Tom Schehr, to request a larger banquet room! Esteemed featured speakers that comprised a knockout lineup included Chief Judge Gerald E. Rosen, author and former U.S. Attorneys' Office Criminal Division Chief, Ross Parker, University of Michigan President, Mary Sue Coleman, and Michigan Governor Rick Snyder.

Judge Michelson also praised the successful Bench-Bar Conference entitled "Media and the Law" that brought some of the nation's high-profile legal talent and NBC correspondent Chris Hansen to the lovely Henry Hotel in Dearborn. Joined by prominent local lawyers and judges, the panelists debated and discussed the challenges of the relationship between the media and the bench and bar.

President-Elect Michael Riordan explained the Judicial Institute and Secondary Education Workshop; Tom McNeill summarized membership initiatives; and Michael K. Lee reported on pro bono projects including the pro se help desk.

Immediate Past President, Elisa Angeli Palizzi, spoke at length of the Chapter's diversity efforts, underscoring the importance of this program to the officers and members.

As a testament to the robust Chapter that we have become, time did not permit verbal recognition of all of the 2010-2011 activities. However, President Michelson directed everyone's attention to the 10-page chronology which included among other terrific initiatives of Past President Honorable Mark Goldsmith, a fascinating Book Club experience with Christopher Graveline, co-author of *The Secrets of Abu Ghraib Revealed: American Soldiers on Trial*.

Despite the press of time, the past presidents would not depart before enthusiastically singing the praises of President Michelson, her fellow officers, and Board for

(continued on page 14)

## Presidents' Luncheon *(from page 13)*

*(from page 13)*

a simply remarkable year. Magistrate Judge Michelson was singled out for her infectious sense of humor that imbued fun into an ambitious agenda solidly packed with legal programs, seminars and outreach programs. They noted that once again, National recognized the Chapter's success with multiple awards including its 8th consecutive outstanding newsletter designation. They reminisced about the Chapter's modest beginnings and expressed a sense of wonder over its current exemplary trajectory. On a final note, they remembered with great pride the recent investitures of Judges Goldsmith and Michelson, accomplishments so emblematic of the quality of our leadership.

## Gilman Award Luncheon

Chapter members once again were addressed by a prominent leader at this year's Leonard R. Gilman Award Luncheon, the 27th such event honoring the excellence, professionalism, and commitment to public service of Len Gilman, who was U.S. Attorney at the time of his death in 1985. This year, the keynote speaker was Michigan Governor Rick Snyder, who focused upon the basic principles that underlie his plan for the reinvention of State government. The Governor was introduced by his longtime friend, Chief Judge Gerald E. Rosen, the person who got him interested in politics thirty years ago.

The Award recipient, Wayne Pratt, an Assistant U. S. Attorney and Chief of the Health Care Fraud Unit, was introduced by his own longtime friend and colleague, Chapter Past President Michael Leibson (himself a former Gilman Award recipient), who recalled Len Gilman as "a man who spent his entire professional life in public service as a prosecutor yet never forgot that every case involved unique human beings and that compassion was not weakness."

"This Award," Leibson continued, "is given annually to a person who emulates Len's commitment to excellence, professionalism and public service in the criminal justice system." This led him to a description of the recipient, who "so clearly represents what Lenny was all about" -- including the belief "that the lawyer's code of ethics is not a ceiling but a floor and that conduct has to be more than ethical, it has to be right."

"Wayne's World," Leibson concluded, is not merely a fictional basement in Saturday Night Live reruns but rather is a real venue in the U.S. Attorney's

Office. "The key words in this real Wayne's World are honesty, integrity, compassion, competence, intelligence and humility"; and Wayne Pratt is "a man who by his every action sustains the memory and values of Len Gilman." Pratt then addressed the audience, expressing his gratitude in receiving the award, which he considered a highlight in his career.

## Law Clerk Panels

In March and April of this year, both current and former Federal law clerks participated in panel discussions with current students at all law schools in Michigan. These panel discussions focused on both the Federal clerkship application/hiring process and the experiences gained during the clerkship itself. The panel format also allowed for direct student/panel member interaction and questions, which led to discussions ranging from the practical aspects of clerking to the Federal judicial process and structure itself.

The panels generally involved a joint effort between the law schools' career services departments and the Chapter's Law Clerk Committee. As such, the law schools and Committee were very thankful, not only to all of those current and former clerks who participated



—— detroitlegalimaging.com ——

Coding
Document Imaging
Document Photocopying
Electronic Discovery
Graphic Services
OCR
Printing
Trial Boards
Trial Services

**Troy Richard**

Owner/ Sales Manager
C 313.407.4624
troy@detroitlegalimaging.com

550 W. Fort St.
Detroit, MI 48226
313.962.4020

in the panels – including Krystal Johnson, Brad Darling, Chantale Fiebig, Andrew Lievense, Christina Farinola, Rita Foley, Steven Cares, Sean Cowley, Michelle Quigley, Andrew Goetz, Sara Woodward, and others – but also to all of the judges who provided the experiences and allowed their clerks to participate.

## Bench-Bar Conference: Media and the Law

On April 28th, Chris Hansen, NBC Correspondent, host of "To Catch a Predator" and former WDIV-TV reporter, captivated nearly 200 members of the Chapter's bench and bar while he spoke at this year's Bench-Bar Conference at the Henry Hotel in Dearborn. His discussion of his experience with the local and national media perfectly suited this year's Conference theme of "Media and The Law."

Magistrate Judge Mona K. Majzoub hosted the program which, in addition to Chris Hansen, consisted of two panel discussions about media and the law. The first panel, entitled "Navigating a High Profile Case," was moderated by Chief Judge Gerald E. Rosen. Nationally recognized and respected attorneys, who have represented high-profile clients, shared their experiences and offered insights about handling such cases, including Charles Babcock (counsel for Oprah Winfrey), Anthony Chambers (counsel for Umar Farouk Abdulmutallab), William Jeffress (counsel for Scooter Libby), Robert Morvillo (counsel for Martha Stewart), and Ira Sorkin (counsel for Bernie Madoff). District Judge Nancy G. Edmunds completed the panel, providing a judicial perspective on managing such cases.


*Magistrate Judge Mona K. Majzoub and Chris Hansen. Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.*

The second panel discussion was entitled "Expectations: Can't Live With Them, Can't Live Without Them." It was moderated by Rod Hansen, long time WJR radio personality and current Media Liaison for the Eastern District of Michigan. The panel, comprised of journalists, lawyers and judges, provided a lively and frank discussion and a wide array of viewpoints and perspectives on numerous issues pertaining to the relationship between the bench, bar, and media, including access to grand jury witnesses, post-trial access to jurors, the impact of social media, and the pros and cons of talking to or not talking to the media.

The panelists included Circuit Judge Richard Suhrheinrich, Judge David M. Lawson, U. S. Attorney Barbara McQuade, David Ashenfelter (Detroit Free Press), Thomas Cranmer (Miller Canfield/WXYZ-TV), Kevin Dietz (WDIV-TV), Marie Osborne (WWJ Radio), Bankole Thompson (Michigan Chronicle), David DuMouchel (Butzel Long) and Richard Helfrick (Federal Defender Office). The lively program was followed by a fabulous hors d'oeuvres and cocktail reception.


*Chris Hansen. Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.*

Many thanks to Miller Canfield for hosting all of the panelists in a suite at Comerica Park the evening prior to the Conference. All of the panelists, particularly those from out-of-town, thoroughly enjoyed their experience at Comerica Park.

Finally, thanks to Conference Co-Chairs AUSA Sarah Resnick Cohen and Frank Ortiz of Dickinson Wright as well as the following Committee members for their hard work in developing this year's Conference: Magistrate Judge Laurie Michelson, Brian Figot, Kim Altman, Jennifer Newby, Matt Allen, Andrew Densemo, Joe Richotte and Mike Leib.

## Rutter Seminar Held

On June 23rd, the Rutter Group held a seminar titled "Game Changers" at the Westin Book Cadillac Hotel. Chief Judge Gerald E. Rosen, Judge David M. Lawson, and prominent practitioner and Chapter member Thomas W. Cranmer of Miller Canfield led the well-attended seminar. Using entertaining hypotheticals designed around "James Bond" books and movies, the presenters educated attorneys and law clerks on the December 2010

*(continued on page 16)*

## Rutter Seminar *(from page 15)*

amendments to the Federal Rules of Civil Procedure and recent case law.

Among the most important amendments the panel discussed were the amendments to Fed. R. Civ. P. 56. The panel warned practitioners to be aware of the shift of the rule's subsections and identified the various changes to the rule.  This includes the deletion of the delay required before a motion is filed (subsection (b)), a provision permitting the court to enter an order setting forth material facts not genuinely in dispute and that will be treated as established in the case (subsection (g)), and express permission for courts to sua sponte enter summary judgment (subsection (f)(3)).  Significantly, Rule 56 now reflects what case law previously required: that a party must support assertions with citations "to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1) (emphasis added).

Relevant to the evidence required to support or respond to a summary judgment motion, the panel discussed the Court of Appeals for the Sixth Circuit's decision in *Arel, S.R.L. v. PCC Airfoils, L.L.C.,* 448 F.3d 899 (2006).  In *Arel*, the Sixth Circuit softened its instruction on how courts should treat an affidavit that contradicts the affiant's prior sworn testimony. According to *Arel*, the court first should determine whether the affidavit directly contradicts the prior sworn testimony.  448 F.3d at 908.  "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id*.  Where there is no direct contradiction between the affidavit and prior sworn testimony, the Sixth Circuit instructed that "the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id*.

The panel identified Fed. R. Civ. P. 26(b)(4)(B) and (C) as containing "perhaps the biggest changes in the rules" with the 2010 amendments.  These changes include the privilege afforded to an expert witness' draft report(s), regardless of the form, and certain pre-trial communications between a party's attorney and an expert.

The seminar provided an entertaining update on the Federal Rules and Sixth Circuit case law relevant to pretrial practice.  It is a must for practitioners seeking to stay on top of their game.

# Law Day 2011 The Legacy of John Adams



*The Legacy of John Adams.  Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.*

On Monday, May 2nd, the Court, the Chapter, and the United States Attorney's Office co-hosted an open house at the Courthouse to celebrate Law Day. The theme of this year's event provided an opportunity to explore and celebrate the life of John Adams, second President of the United States, resistance leader and patriot, advocate and diplomat, constitutional theorist and political activist.  Law Day exhibits, presentations and displays focused on the legacy of John Adams as a lawyer who defended the rights of the accused, even in cases involving unpopular clients and in matters that generated public controversy.  Courthouse tours were also given, which were attended by many local students.

Chapter members AUSA Susan Gillooly and VA Staff Attorney Dona Tracey co-chaired the event. Participants included members of the Federal Judiciary, Federal and State law enforcement agencies, and Federal agencies including the Department of Defense, Secret Service, Department of Justice, and National Labor Relations Board.

Once again, the "Ask the Lawyer" pro bono program provided consultations to over 80 self-represented litigants.  The program included 30 volunteer lawyers, four court staff, six Cooley Law School students, and two Cooley administrators.  Altogether, they served 82 self-represented litigants who each received a minimum 30-minute consultation.  Judge Denise Page Hood and Judge Victoria A. Roberts and their staffs also were major contributors.

The Chapter and the Wolverine Bar Association Pro Bono Committees worked together to organize the event. The Chapter would like to thank the following volunteer lawyers, many of whom are Chapter members: Patrice Arend, Kevin Carlson, Emma Chen, Vince Colella, Trent Collier, Chris Cornwall, Rhonda Craig, Tanisha Davis, Michael Dezsi, David Eisenberg, Douglas Eyre, Robert Fetter, Michelle Fisher, Tim Howlett, Karen Kienbaum, Matthew F. Leitman, Daniel Manville, Elisa Angeli Palizzi, Jim Parks, Mark Pieroni, Toni Raheem,

*(continued on page 18)*



*Ask the Counselor of Civility*

Dear Counselor of Civility,

I am outside counsel for a Big Ten university. After the University's administration learned that some alums with more money than sense may have transgressed some of the National Collegiate Athletic Association's more persnickety rules, they had me file a declaratory judgment action against the NCAA, in the hopes of avoiding a fine, or worse. Attorney Buck I. Fann, of Yuplay, Ower, Rulz & Suffr, represents the NCAA.

Apparently concerned that my client may not have declared all in its complaint and Rule 26 exchanges, Attorney Fann filed discovery requests. The University responded with some of the information sought but objected to other requests. Although Attorney Fann and I had a brief telephone conversation about the requests and responses, we didn't have enough time to discuss the issues and agreed to talk some time soon, exchanging cell phone numbers.

A few weeks later, the NCAA's motion to compel popped up in my ECF notifications on Monday morning, along with an email sent early the previous Friday evening, requesting my concurrence. In the motion, Attorney Fann represented that his office had sought my concurrence by "electronic means" on an unspecified date but was unable to reach me. Later that day, I discovered that his assistant, Jen Y. Textre, sent a text message to my cell phone late on Friday afternoon and wrote on my firm's FaceBook wall, requesting my concurrence.

Please know that I never text and have never looked at my firm's FaceBook wall as I consider such forms of communication to be undignified. I do use e-mail and a cell phone to communicate, although I prefer to use letterhead on bond paper.

Did Attorney Fann fulfill his obligation to seek concurrence as required by Local Rule 7.1(a)? If not, should I move to strike?

Technologically confounded,
Attorney Maisie N. Blew

Dear Attorney Blew,

No, Attorney Fann did not comply with either the letter or the spirit of Local Rule 7.1(a), requiring that a movant ascertain whether a contemplated motion will be opposed. Perfunctory gestures will not satisfy the obligations imposed by LR 7.1(a). Movant's counsel must show that he made a genuine effort to seek concurrence, but, was unsuccessful:

(2) If concurrence is not obtained, the motion or request must state:

(A) there was a conference between attorneys or unrepresented parties and other persons entitled to be heard on the motion in which the movant explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought; or

(B) despite reasonable efforts specified in the motion or request, the movant was unable to conduct a conference.

LR 7.1(a)(2) (A) and (B). To encourage meaningful efforts by all parties to avoid unnecessary motions, the rule allows the Court to tax costs for the "unreasonable" withholding of consent. Knowing failure by a movant to fulfill his or her obligation to seek concurrence with a motion can lead to sanctions for non-compliance. LR 11.1.

In your first conversation with Attorney Fann, you agreed to a later call to discuss concerns with your client's discovery responses and provided him with a means of contacting you easily: your cell phone. He didn't call you. His last minute efforts through his legal assistant to seek your concurrence moments before filing the motion to compel were not reasonable, nor were his general representations of his efforts at electronic communication a candid disclosure in the motion that meets the requirements of LR 7.1(a).

While using Facebook, Twitter or other social media to communicate has its hazards for the famous and not-so-famous, the Local Rule does not limit the means of conferring. Although I share your nostalgia for letterhead, text messages are a widely accepted means of communicating by cell phone. This is not to say that a substantive discussion of discovery issues should be conducted by text or tweet - if nothing else, thumbs would ache-but, texting a brief message to a personal cell phone to arrange a conference is appropriate. Where Attorney Fann fell short was in failing to follow up on your agreement to confer with him regarding your client's discovery responses, and then having his assistant engage in last-minute gestures intended to meet the form, but not the substance, of the Local Rule. He also breached the Civility Principle that calls for attorneys to make good faith efforts to amicably resolve objections to matters contained in discovery requests.

As to how you should respond, follow the Local Rule. Call him to explain the grounds for your contemplated motion to strike. Then, remind him that Local Rule 37.1, governing motions to compel discovery, requires that the parties confer in advance of the hearing "in a good faith effort to narrow the areas of disagreement." Ask him to confer with you on the substance of his motion to compel before your response is due, and see if you can't resolve the issues. Chances are, you'll meet and get the motion resolved. If he won't meet, then you may just want to inform the Court of your willingness to confer in your response to his motion, as hurling cross-motions regarding discovery disputes rarely aids resolution of the case.

As for his assistant's scrawl on your Facebook wall, let him know that unless he wants all the "friends" of your firm to see his communications with you, he might want to ask Jen Y. Textre to use voice-mail.

Civil regards,
Counselor of Civility

## Law Day *(from page 15)*

Wendy Readous, Wendy Richards, John Stockdale, Jr., Sherry O. Taylor, and L. Pahl Zinn.

Over 300 guests enjoyed an all-American lunch of hot dogs, chips and cookies as part of the festivities.

## Law School Motion Days – Year In Review



*"Ask the Lawyer" program during Law Day.*

In early February, UDM law students in Professor Gary Maveal's first-year Civil Procedure class packed Judge Tarnow's courtroom to hear oral arguments on summary judgment. The courtroom, including the jury box, was standing room only. The Court kept the litigants on their toes, and the students asked great follow-up questions. As an added treat, Judge Tarnow scheduled a criminal plea, which the students also heard. Special thanks to Cynthia Filipovich and law students Gordon Pritchard and Nolan Yaldo for making the afternoon such a resounding success.

In the Eastern District, we are lucky to have judges who are not only active in the Chapter, but also willing to open their time and their dockets to local law school students. During the Chapter's Law School Motion Days, judges hear motions from actual pending litigation in front of an audience of law students and discuss the process with the students. These days are a fantastic opportunity for students to see federal practice in action and for the Chapter to introduce itself to aspiring federal practitioners.

This year, the Motion Days were a great success, with Judges Bernard A. Friedman, John Corbett O'Meara, Victoria A. Roberts, George Caram Steeh and Arthur J. Tarnow hearing motions before full houses of students from Wayne State University Law School, Thomas M. Cooley Law School, University of Michigan Law School, and University of Detroit Mercy School of Law.

In late January, Judge Friedman heard argument on summary judgment motions in Wayne Law's Patrich Auditorium. Each year, Professor Anne M. Burr, Director of the Legal Research and Writing Program, arranges Motion Day to kick off the second semester advocacy program for 1L students at Wayne. This year, over two hundred 1Ls attended to gain perspectives on oral advocacy. The event was followed by a luncheon honoring Judge Friedman attended by Professor Burr, Wayne Dean Robert Ackerman, select members of the faculty, and 3L members of moot court and law review. In practice oral argument sessions for their own moot court problem held later in the week, the 1L students expressed appreciation for the opportunity to observe federal court at Wayne Law.

Cooley's students had twice the fun. Under Dean Joan Vestrand's leadership, students at the Ann Arbor campus helped to organize a permanent Chapter Student Committee. As a first order of business, in late February, they arranged a field trip to Judge O'Meara's courtroom to hear his motion docket. The Committee plans to keep the general student population informed about hearing dates on interesting cases for additional trips to the courthouse.

Then, in early March, Judge Roberts traveled to the Auburn Hills campus to hear several dispositive motions, including some very interesting employment law issues she selected. Before the hearings, the Court met over lunch with student leaders, Professor Alan Gershel and Dean John Nussbaumer. Afterwards, the motion hearings in the Mock Courtroom were very informative for all the attending classes. The Court and the lawyers stayed late to answer questions, and the students continued to discuss the cases for days, eager to hear how the Court resolved the matters. Special thanks to Professor Gershel and Choi Portis, President of the Auburn Hills FBA Chapter, for her help in putting the event together.

Most recently, Judge Steeh took time out on March 31st (before attending Past President Laurie Michelson's investiture as a U. S. Magistrate Judge that afternoon!) to travel to the University of Michigan. The Court selected two great motions to dismiss for Professors Nick Bagley and Len Niehoff's civil procedure and evidence students. In the first hearing, a packed house saw a lively intellectual property dispute about a TV commercial, which offered a fun and funny view into the practice.

The second motion drew a standing room only crowd to hear expert oral argument in a complicated securities matter. The Court's and the lawyers' abilities to simplify and get to the heart of the matter was impressive and highly instructive. Special thanks to Assistant Dean David Baum and UM Law School Student Senate President Rob Swenson for helping to make the day such a success.

It is a rare treat for our local law students to get such direct exposure to the Federal Bench. All in all, these days provide an important and (word has it) memorable experience. So, with the students' summer break in full swing, here's looking forward to Motion Days next year!

## Book Club Meets

On May 26, 2011, the FBA Book Club gathered to discuss *The Eyes of Willie McGree: A Tragedy of Race, Sex, and Secrets in the Jim Crow South*, by Alex Heard.

Willie McGee, an African American man, was arrested, tried and convicted three times, and ultimately executed, for the rape of a white woman in 1940s Mississippi. The book is an account of the trials, but it also is an account of the political and social context in which the trials took place, including a discussion of the assumptions about race and sex during that time period and the notoriety the case received over the course of the many trials and appeals. The author seeks to solve the mystery of whether McGee was guilty or not.

The Chapter's Book Club co-chairs Andy Doctoroff and Matthew Schneider led the discussion. Topics included: issues of racism, sexism, and racial injustice; life in the deep south in the 1940s; the significance of the book's title; whether remnants of an unequal justice system pervade the legal system today; the impact of outside forces, such as publicity, on court proceedings; and the author's ultimate conclusion regarding McGee's guilt or innocence. The event was well attended and the book was well received by the group.

The Book Club's next meeting date and book selection will be announced as soon as they are known. Book suggestions for future meetings of the club can be directed to the Book Club co-chairs.

## Calendar of Events

**July 20**    **Ninth Annual Summer Associate/ Intern Event**
Summer associates and interns are provided with practical advice and suggestions that will serve them well as future lawyers and are afforded the opportunity to networ with each other and meet members of the local legal community and federal judiciary.
11:30 A.M.   Registration, Networking and Lunch
12:15 P.M. to 1:15 P.M. Substantive Programming

**Sept 22**    **State Of The Court Luncheon**
Speaker: Hon. Gerald E. Rosen
Westin Book Cadillac Detroit
11:30 P.M.   Reception
12:00 P.M.   Lunch

**Nov 17**    **Rakow Scholarship Awards/ Historical Society Luncheon**
*A Wrong Without a Remedy: Milliken v. Bradley and the Controversy Over School Desegregation*
Westin Book Cadillac Detroit
11:30 P.M.   Reception
12:00 P.M.   Lunch

**Dec 6-7**    **New Lawyers Seminar**
Theodore Levin U.S. Courthouse
8:00 A.M.   Registration

**Dec 7**    **Chapter Gala Holiday Reception**
4:30 P.M.
Hold the Date:
Further Details to Follow

**Updates and further developments
at www.fbamich.org
See "Hot News" and
"Events & Activities"
Online registration available
for most events.**

**Newsletter Committee:**

Kimberly G. Altman,
Co-Editor in Chief
Career Law Clerk to
Hon. Avern Cohn
(313) 234-5160

Christina L. Farinola,
Co-Editor in Chief
Career Law Clerk to
Hon. Paul J. Komives
(313) 234-5200

Michael J. Riordan
Assistant United States Attorney
(313) 226-9602

Christine M. Dowhan-Bailey
(734) 624-7219

John P. Mayer
Management Consultant
(734) 558-5593

Thomas D. Esordi
The Kitch Firm
(313) 965-7446

Michael D. Socha
Ally Legal Cousel
(313) 656-5069

Andrew J. Lievense
Assistant United States Attorney
(313) 226-9665

Lauren Mandel
Career Law Clerk to Hon. Patrick J. Duggan
(313) 234-5148

**Executive Director:**

Brian D. Figot
(248) 547-3030
fbamich@fbamich.org

---

**Federal Bar Association
E. D. Michigan Chapter**
PO Box 20759
Ferndale MI 48220

**RETURN SERVICE REQUESTED**

PRESORTED
STANDARD
U.S. Postage
PAID
Wyandotte, MI
PERMIT #153



# Exhibit 7

Winter 2018

# FBAnewsletter

Federal Bar Association - Eastern District of Michigan Chapter - **60** years of service to our Federal Bench and Bar

## Chris Ilitch to Keynote McCree Award Luncheon

The Chapter's annual Wade Hampton McCree, Jr. Luncheon will be held on Tuesday, February 27, at the Westin Book Cadillac. The reception will begin at 11:30 a.m. and the luncheon at noon.

The Wade Hampton McCree, Jr. Award for the Advancement of Social Justice will be presented at the luncheon. The Award honors individuals or organizations that have made significant contributions to the advancement of social justice, including in areas involving poverty, promoting economic or educational opportunity, or fighting discrimination involving race, gender, ethnicity, national origin, religion, or economic status. More information about Judge McCree's career and contributions to the legal profession can be found at: https://fbamich.org/about-fba/awards/

Chris Ilitch, President and CEO of Ilitch Holdings, Inc. will be the keynote speaker. Ilitch Holdings is a professional services company that supports certain businesses that were founded or purchased by his parents, Mike and Marian Ilitch, including Little Ceasars Pizza, the Detroit Red Wings, Olympia Entertainment, and the Detroit Tigers, among others. These businesses employ 23,000 people and in 2016 had a combined revenue of $3.4 billion.

*(continued on page 2)*

### INSIDE THIS ISSUE

| | |
|---|---|
| Dave Weaver | pg. 2 |
| How Are Federal Judges Appointed? | pg. 3-4 |
| Annual Holiday Party | pg. 4 |
| Complex Commercial Litigation | pg. 5 |
| Book Club | pg. 5-6 |
| Rakow/Rom Awards Luncheon Historical Society Annual Meeting | pg. 6-7 |
| Luncheon Sponsors | pg. 7 |
| 42nd Annual New Lawyers Seminar | pg. 9-10 |
| Law Clerk Happy Hour | pg 10 |
| Calendar of Events | pg. 11 |

**Special**

## President's Column
### *Jeffrey Appel*

2018 promises to be an exciting and busy year for the Chapter. The hard work of our Officers and Committees will again pay off for our members. Chief Judge Denise Page Hood and the federal judiciary continue to offer extraordinary support through their collaboration with the Chapter. Our Officers continue to focus on innovative programming and initiatives that reflect the increasingly valuable benefits of Chapter membership.

On March 23, our Chapter is co-sponsoring a seminar with Professor Alexander Reinart of Cardozo Law School and Judge Judith E. Levy speaking on the "Art of Pleading." Professor Reinart represented the plaintiff in *Ashcroft v. Iqbal* from the trial level through the U.S. Supreme Court, and this seminar promises to be an outstanding one.

Some initiatives that we are involved with include providing assistance to the Federal Court Pro Se Clinic, which recently began operation and is run by the University of Detroit Mercy School of Law. Our Master Lawyers Section is designing programs for law students and newer attorneys to provide insight into practical aspects of legal practice and the variety of practice areas available.

Our Diversity Committee, among other projects, is assisting the Retooling Detroit Literacy Project, where attorneys tutor at-risk first graders in the Detroit Public Schools. For those unable to participate in our programming in person, our Chapter's website is filled with more valuable resources and information for our members than ever.

While we continue to sponsor traditional seminars in the various practice areas, we are exploring new technology to bring even more information that is valuable to our members via our website and other modalities. We

**WINNER 15 YEARS** National FBA Outstanding Newsletter Award

*(continued on page 2)*

## President's Column (continued)

have several "Fed Talks" (our version of the popular TED talks) covering various topics on the practice of law available to view, and several more currently in production. We are also exploring innovative networking initiatives that will allow participating members to list themselves and their specialty areas on our website so other members can contact them for practical advice.

This year, to allow us to provide even more valuable programs and resources for our members, we implemented an increase in chapter dues. This change ensures the fiscal integrity of our Chapter. We are absolutely committed to further enhancing the value of Chapter membership.

Due to stellar work by our Officers, Executive Director, and Committee chairs and members, we are having another successful and productive year. Please consult our calendar on the website for a complete list of upcoming programs.

## McCree *(from page 1)*

Ilitch has held numerous roles throughout the Ilitch companies during his more than 30 year career, including governor and president and CEO of the Detroit Red Wings, as well as the president and CEO of the Detroit Tigers. Ilitch also serves as chairman of Ilitch Charities, a nonprofit organization that promotes charitable purposes aimed at developing communities and enhancing lives.

Currently, Ilitch is leading an ambitious development effort: The District Detroit, a sports and entertainment district comprised of eight world-class theatres, five neighborhoods, four professional sports teams and three multi-use sports facilities, including the new Little Caesars Arena.

Ilitch earned a bachelor's degree in business administration from the University of Michigan.

More information about Ilitch can be found at: http://www.ilitchholdings.com/leadership-team/christopherilitch.aspx

Needless to say, the Chapter is honored to have Ilitch as the keynote speaker of this year's McCree Luncheon.

For those affiliated with organizations that are sponsors of the 2017-18 Luncheon Series, tickets likely are available through your organization.  For others, the luncheon is $45 for members,  $60 for non-members, and $35 for law clerks.  Tickets are available on-line at www.fbamich.org.



## Dave Weaver, Clerk of Court/ Court Administrator

In June 2017, the Court approved a one year pilot program to establish a Pro Se Legal Assistance Clinic, in partnership with the University of Detroit Mercy School of Law. Since then, detailed planning and preparation has taken place and the Clinic's official opening occurred on Wednesday, January 17, 2018. The Pro Se Legal Assistance Clinic will provide legal advice to low-income citizens who are representing themselves. Detroit Mercy Law's Anne Yantus, Director of the law school's clinical program, is quoted as saying, "There is a need for this type of work, and a pro se clinic will bring value to litigants, the Court, and our students."

The project was the idea of Judge Victoria A. Roberts, which was embraced by Chief Judge Denise Page Hood, who, in a recent press release stated that since becoming Chief Judge, she has been looking for ways to increase access to the federal court for low income residents. In addition to the Pro Se Legal Assistance Clinic, the Clerk's Office has created a new position, Pro Se Case Administrator. Jeremy Tyrrell holds that position, reports to Court Operations Manager Kevin Williams, and will work with pro se filers through the Clerk's Office and in cooperation with the Pro Se Legal Assistance Clinic.

The Clinic will operate from Office 463 in the Levin Courthouse under the direction of attorney Kevin Carlson, an adjunct law professor at the University of Detroit Mercy. He will supervise eight students to assist pro se litigants. The clinic will operate on Mondays, Wednesdays, and Fridays from 1:00 p.m. to 5:00 p.m.

Remember, if you have any comments, questions or suggestions, do not hesitate to contact me at:  david_weaver@mied.uscourts.gov.

# How Are Federal Judges Appointed?

**By Susan E. Fairchild\***

As of January 19, 2018, there are 120 vacancies in the U.S. District Courts. The total number of authorized judgeships is 677. Almost 18% of the seats are vacant. There are 36 nominees pending.

So how are federal judges appointed? Although some variables exist and it can vary, the process is based on the United States Constitution and follows additional steps established by tradition.

1. If one or more of a state's Senators are of the same political party as the President, then home state Senators forward names of potential nominees to the President for consideration. The Constitution specifies no special qualifications for nominees, however, federal law requires that nominees be residents of the particular district or circuit at the time of their appointment and that they continue residency during their judicial service. If a state's Senators are from an opposing party, according to custom, names of potential nominees come from various sources, and the President will consult the state's Senators to determine the acceptability of the candidate under consideration prior to the President nominating a person.

2. Before being nominated, each candidate is evaluated by the White House Counsel's Office and the Department of Justice. A confidential background investigation is conducted by the FBI and an independent evaluation is conducted of candidate finalists by a committee of the American Bar Association. The ABA Committee consists of 15 lawyers with various professional experiences. Following investigation and interviews by the ABA Committee, an initial report is prepared with a rating of the candidate of "well qualified," "qualified," or "not qualified." After review by the entire Committee, the chair confidentially reports the ABA rating of the candidate to the White House. The rating becomes part of the candidate's overall profile which will be considered (strictly on an advisory basis) by the President during the nomination process. When the process is complete, if the President approves the candidate, the President signs a nomination message, which is then sent to the Senate for consideration.

3. The Senate Judiciary Committee receives the nomination and its staff conducts an investigation into the nominee's background and qualifications. The nominee completes a comprehensive detailed committee questionnaire. Documents from other agencies may be reviewed. During this phase, the Judiciary Committee, through its "blue slip" procedure, obtains input from the home state Senators regarding their approval of the nominee. The "blue slip" is a one page form, on blue Senate letterhead, written by a state Senator from where the judicial nominee resides, expressing the senator's support or disapproval of the nominee. The process originated 100 years ago, and has remained a tradition of senatorial courtesy. The form is sent to the state senators by the Senate Judiciary Committee. The state senators have the option of returning the blue slip in support or opposition to the nominee, delaying returning it, or forever choosing to not return the form. Failure to return a blue slip has, over the last 20 years, blocked a hearing on the nominee, essentially killing the nomination. This pre-hearing phase can extend over a period of months.

4. If a nominee makes it through the Senate Judiciary Committee evaluation, a confirmation hearing is scheduled. The hearing is placed on the Executive Calendar. During this hearing, nominees are subjected to a question and answer session with members of the Senate Judiciary Committee. Questions posed may include inquiries about credentials, previous experience, and the role of judges. Each nominee is allowed to make an introductory statement. Public witness statements, both live and written, may be received. The Committee can report favorably on the nominee, report unfavorably on the nominee, or can pass the nominee without recommendation. Only rarely will the Committee vote to reject a nominee or report on the nominee other than favorably. In such case, the nomination can continue despite the lack of support by the Committee.

5. Most federal circuit court or district court nominations have reached confirmation by a unanimous consent agreement. According to procedure, and in most cases, the Senate, by unanimous consent, takes up nominations for Senate floor consideration, and also arranges for nominations to either receive up or down confirmation votes or be confirmed simply by unanimous consent. If a roll call vote is requested, a simple majority of Senators voting, with a minimal quorum of 51 present, is required to approve a nomination. In cases involving strong opposition to a nomination, or in a case in which unanimous consent to reach confirmation cannot be attained, the Senate may use the cloture process and vote on cloture motions to bring floor debate to a close

*(continued on page 4)*

## Federal Judges *(from page 3)*

on a nominee. Currently, a simple majority of Senators voting is needed to close debate on nominations, except nominations to the Supreme Court.

6. Sometimes, judicial nominees are not confirmed. This usually happens when nominations in committee or on the Senate's Executive Calendar are returned to the President at the end of a session or upon a recess or more than 30 days. It is a rare occurrence that the Senate votes to reject a nomination. Of interesting note is that the judicial confirmation process in the Senate is currently longer than in the past. During the Clinton, Bush, and Obama presidencies, the Senate has taken longer to confirm district court and circuit court nominees – with average times from date of first nomination to confirmation now being measured in multi-month or half-year periods.

7. After a nominee has been confirmed by the Senate, the President signs the nominee's commission – a formal document empowering the nominee to assume the judicial office. This usually occurs within several days after Senate confirmation. The commission is then sent to the Department of Justice, which forwards it to the nominee, with other important forms, including the statutory oath of office. The nominee must sign the commission when the oath of office is executed.

8. The final step in the process is the investiture. During this ceremonial event, held at the convenience of the new judge, the new judge is sworn in, often in the presence of family and friends. This is not a required event, and the judge may assume duties prior to this event.

*\*Susan Fairchild is an Assistant United States Attorney in Detroit and the Immediate Past President of the Chapter.*

## Annual Holiday Party

The Chapter threw its annual Holiday Party on December 6 at the Motor City Kitchen at the DoubleTree Suites by Hilton Hotel-Fort Shelby. Guests enjoyed hors d'oeuvres, spirits, and camaraderie while being treated to the music of Executive Magistrate Judge R. Steven Whalen's jazz and blues band, *The Cat's Pajamas*. In addition to Magistrate Judge Whalen, the band features Dan Bretz, Ron Bretz, Barry Goldman, and James Hart.



*Annual Holiday party attendees included: Elisa Angeli Palizzi, Chapter President Jeffrey Appel, Immediate Past President Susan Fairchild, Magistrate Judge Mona K. Majzoub, Bankruptcy Judge Mark A. Randon, District Judge Victoria A. Roberts, Jeff Sadowski, retired District Judge Gerald E. Rosen, District Judges Terrence G. Berg and Mark A. Goldsmith, and Chapter Vice President Matt Lund.*

Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.

Guests also enjoyed a brief presentation of the Court Historical Society's "Avern Cohn Award For Excellence in the Collection, Preservation and Interpretation of Michigan Legal History." The award was presented to Kevin Ball for his book *Adversity and Justice: A History of the United States Bankruptcy Court for the Eastern District of Michigan* (Wayne State University Press). Historical Society Board President Matthew Lund presented the award to Ball who, in accepting the award, took special note of the encouragement and guidance given by Bankruptcy Judge Walter Shapero and District Judge Avern Cohn.

Thanks go to event chairs Tom Cranmer, Elisa Angeli Palizzi, and Jeff Sadowski for their effort in planning another successful event. And, of course, special thanks go to *The Cat's Pajamas* for another wonderful performance.

## Complex Commercial Litigation

On December 7, 2017, the Chapter's Complex Commercial Litigation Committee hosted a "Discussion with the Bench" on creative alternatives to a full trial and best practices for complex litigation.

The esteemed panelists included District Judge Robert H. Cleland, District Judge David M. Lawson, and Magistrate Judge Anthony P. Patti. Committee co-chairs A. Michael Palizzi, Jeffrey Sadowski, and Mark Aiello moderated the panel, which was held in the Detroit Room of the Levin Courthouse. Also in attendance were District Judges Marianne O. Battani, Terrence Berg, Avern Cohn, and Sean Cox, along with about 50 members of the bar.

The seminar began with a debate on the merits of summary jury trials, a little known alternate dispute resolution procedure authorized by Rule 16 of the Federal Rules of Civil Procedure. A summary jury trial is, in essence, a mock jury trial based upon summarized evidence. Judge Cleland, the only member of the panel with experience with the procedure, said he found it could be valuable under the right circumstances. Judge Lawson expressed some reservations, and questioned whether the court should be empowered to call citizens to serve on an advisory jury, and whether mock trials should be publicly conducted and funded. Magistrate Judge Patti noted that the procedure could be useful to facilitate settlement in cases where one or more parties had an unrealistic view of the strength of their case. The panelists were in general agreement that the jurors should be told of the advisory nature of their role.

The panel also addressed consent references to magistrate judges for all proceedings, including civil jury trials. The judges noted that the Eastern District of Michigan has historically had very few cases in which the parties consent to trial before a magistrate judge. Judges Cleland and Lawson noted that this might be due to the culture of the district, or the overall low number of civil jury trials in recent years. All of the panelists urged attorneys to more seriously consider consenting to trial before a magistrate judge, particularly in light of the caliber of magistrate judges in our district. Magistrate Judge Patti made a pitch for consent references, noting that because magistrate judges do not conduct criminal trials, a trial before a magistrate judge will often receive an early trial date.



*On hand to discuss the book with Judge Kethledge (fifth from the left) were: District Judge Mark A. Goldsmith, Book Club Co-Chair Erica Fitzgerald, Immediate Past President Susan Fairchild, Book Club Co-Chairs Andrew Doctoroff and David Fink, District Judge Laurie J. Michelson, Chapter President Jeffrey Appel, and District Judges Avern Cohn and Terrence Berg.*

Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.

## Book Club Meets

Federal judges and attorneys gathered on December 12, 2017, in the Judges' Conference room of the Courthouse to discuss *Lead Yourself First: Inspiring Leadership Through Solitude,* a book co-authored by Sixth Circuit Judge Raymond M. Kethledge and Major Michael S. Erwin.

Judge Kethledge joined the book club meeting in person to answer questions and offer insights about the book. Divided into sections on clarity, creativity, emotional balance, and moral courage, the authors profile historical and contemporary leaders from many fields who have used quiet reflection to make decisions in their leadership roles.

This book, buoyed by the author's participation, garnered the highest book club attendance in years. Led by co-chair Andy Doctoroff, the discussion centered on practical opportunities for leadership and reflection in the legal profession, especially in busy offices where we are surrounded by the internet, information, and meetings.

Judge Kethledge described his inspiration for the book, his extensive research over many years to write

*(continued on page 6)*

## Book Club *(from page 7)*

the book, and his personal habits to facilitate solitude and reflection.

Stay tuned for the book club's next selection and meeting date this spring. Contact the book club co-chairs with your recommendations or for more information.

## Rakow/Rom Awards Luncheon Historical Society Annual Meeting

On November 14, more than 200 members and friends met at the Westin Book Cadillac Hotel for the Edward H. Rakow and Barbara J. Rom Awards Luncheon and the Court Historical Society Annual Meeting.

The Rakow Scholarship Awards are presented each year to an outstanding student of securities, corporation, or business law at each of the law schools in Michigan. Ed Rakow, a founding member of the Chapter, had headed the Securities and Exchange Commission field office in Detroit for 26 years at the time of his death in 1965.

The Barbara J. Rom Bankruptcy Award is presented annually to a bankruptcy practitioner who demonstrates the same level of excellence and dedication in the practice of bankruptcy law as the Award's namesake. For a full description of the Award and nomination forms, please visit the Chapter website.

After introductory remarks by Chapter President Jeff Appel, this year's Rakow Awards were presented by Federal Bar Foundation of Detroit trustees Dennis J. Clark and Edward M. Kronk to the following individuals:

- Patrick Bailey,
  Michigan State University College of Law
- Tanya Murray,
  University of Detroit Mercy School of Law
- Jessica Opila,
  University of Michigan Law School
- Brennan Ackerman,
  Wayne State University Law School
- Andrew Hendra,
  Western Michigan University Cooley Law School

Next, Michael Hammer introduced the Sixth Annual Barbara J. Rom Award for Bankruptcy Excellence.

Bankruptcy Chief Judge Phillip J. Shefferly then introduced and presented the award to David W. Ruskin, the "dean" of the consumer bankruptcy bar in the Eastern District of Michigan. Judge Shefferly described Ruskin's career, which includes more than 40 years of practice. Ruskin was appointed the Chapter 13 trustee in 1982 and has served in that role ever since, including as the only Chapter 13 trustee until 2000. During his career, Ruskin has worked on more than 250,000 cases and been involved in disbursing more than $1 billion to creditors in court-approved bankruptcy plans.

Judge Shefferly also described Ruskin's contribution to the consumer bankruptcy arena, which included efforts to improve the system for debtors, creditors, and their attorneys with his "empathy, compassion, and judgment."

Judge Shefferly next noted Ruskin's impact on the consumer bankruptcy profession. He described Ruskin's service as a mentor and role model for the two other Chapter 13 trustees, his involvement in national Chapter 13 trustee organizations, and his community involvement, such as the co-founder of the Consumer Bankruptcy Association in the area. Ruskin also serves on committees within the Eastern District's Bankruptcy

*Chapter and Historical Society leadership paused for a photograph at the Rakow luncheon, including: Foundation Trustee Ed Kronk, David Ruskin, Chapter President Jeff Appel, Chapter Program Chair Dan Sharkey, Chapter Secretary-Treasurer Fred Herrmann, Alan Harnisch, and Chapter Vice President Matt Lund.*

*Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.*

Court, promotes continuing legal education, and has developed procedures to give financial guidance to consumers going through Chapter 13 bankruptcy. These are only some of his many accomplishments to the consumer bankruptcy community.

After receiving the award, Ruskin began by thanking his family and professional colleagues for their support over his career. He also commented on the consumer bankruptcy system, improvements to that system that have occurred in the Eastern District of Michigan, and the work that still needs to be done.

After lunch, the Chapter and Historical Society took a quick pause to present a special award to Alan G. Harnisch for his decades of service to both groups. Chapter President Jeff Appel and Historical Society President Matthew Lund presented Harnisch with the award. Harnisch was instrumental years ago in the creation of the New Lawyer's Seminar, which continues to be held each year. He also served as Chapter President, a national FBA president, and a trustee and president of the Court Historical Society.

Next, Lund introduced the keynote speaker, Danielle McGuire, an Associate Professor at Wayne State University.

Professor McGuire's comments focused on her forthcoming book, *Murder in the Motor City: The 1967 Detroit Riot and American Injustice,* which addresses the 1967 Algiers Motel murders in Detroit and the subsequent trials.

McGuire is the author of many books and articles on the intersection of race, gender, and civil rights in American history, including *At the Dark End of the Street: Black Women, Rape and Resistence—a New History of the Civil Rights Movement from Rosa Parks to the Rise of Black Power.*

McGuire earned her bachelor's and master's degrees in African American Studies from the University of Wisconsin-Madison. Professor McGuire received her Ph.D. in History from Rutgers University. She has received many awards for her teaching and scholarship. She also has served since 2009 as a Distinguished Lecturer with the Organization of American Historians.

## Luncheon Sponsors

The Chapter gratefully acknowledges the following sponsors of the 2017-2018 Luncheon Program:

U.S. District Court for the
    Eastern District of Michigan
Barris, Sott, Denn & Driker, P.L.L.C.
Behm & Behm, P.C.
Bodman P.L.C.
Brooks & Kushman P.C.
Brooks Wilkins Sharkey & Turco, P.L.L.C.
Bush Seyferth Paige P.L.L.C.
Butzel Long
Clark Hill P.L.C.
Collins Einhorn Farrell P.C.
Computing Source
Conway MacKenzie, Inc.
Crawford & Winiarski Financial Consulting
D4, L.L.C.
Darrow Mustafa P.C.
Dickinson Wright P.L.L.C.
Dykema Gossett P.L.L.C.
Fink + Associates Law
Foley & Lardner L.L.P.
Garan Lucow Miller, P.C.
Honigman Miller Schwartz and Cohn L.L.P.
Howard & Howard Attorneys P.L.L.C.
Jaffe, Raitt, Heuer & Weiss, P.C.
Jones Day
Kerr, Russell and Weber, P.L.C.
Kienbaum Opperwall Hardy & Pelton, P.L.C.
Kitch Drutchas Wagner Valitutti & Sherbrook, P.C.
Maddin, Hauser, Roth & Heller P.C.
Miller Canfield Paddock and Stone, P.L.C.
The Miller Law Firm, P.C.
The Murray Law Group, P.C.
Nitzkin & Associates
Pepper Hamilton L.L.P.
Pitt, McGehee, Palmer & Rivers, P.C.
Plunkett Cooney P.C.
Sommers Schwartz, P.C.
Spectrum Computer Forensics and
    Risk Management L.L.C.
Varnum L.L.P.
Warner Norcross & Judd L.L.P.

# 42nd Annual
# New Lawyers Seminar

The 42nd Annual New Lawyers Seminar was held this year on December 5 and 6 at the Theodore Levin Courthouse. Again the seminar received rave reviews from participants who found the practical practice information imparted invaluable to them as new lawyers.

This seminar is sponsored by the Chapter in conjunction with the Young Lawyers Section of the State Bar of Michigan, and its purpose is to bridge the gap between the theoretical study of law and the actual practice of law. Speakers provide insight and tips in a variety of common practice areas relevant to those in large firms as well as those practicing on their own. As in past years, presenters were among some of the best legal talent in Metropolitan Detroit. This included judges from our local state and federal courts and litigators and non-litigators from a variety of settings including government, big firm, small firm, sole practitioners, and in-house.

The first day of the seminar focused on practice in the federal courts and was moderated by Sarah Resnick Cohen, Assistant United States Attorney. The day began with a welcome to federal practice by Chief Judge Hood who gave a warm greeting to the attendees. Former AUSA and now Executive Director of the Michigan Judicial Tenure Commission



*New Lawyers Seminar attendees being sworn in surrounded by their families.*

Photo courtesy of the New Lawyers Seminar Committee.



*Among those attending the New Lawyers Seminar were: (front row) Fran Yturri, Wayne County Circuit Judge Patricia Fresard, Christine Dowhan-Bailey, District Judge Victoria A. Roberts, and (back row) Albert Dib, Cathrine Wenger, Chapter President Jeff Appel, and Tyler Knurek.*

Photo by John Meiu, courtesy of Detroit Legal News Publishing LLC.

Lynn Helland next said a few words to the attendees about practicing ethically.

This was followed by Karen Hillebrand, an Information Management Specialist with the Court, who provided the ins and outs of the ECF system. Rich Hewlett from Varnum then provided an "Anatomy of a Civil Case," giving the new lawyers an overview of a federal case from start to finish, and explaining differences between state and federal court practice.

A panel comprised of career law clerks Kimberly Altman (Judge Cohn), Jim Carroll (Chief Judge Hood), Marie Coombs (Judge O'Meara), and Jesse Taylor (Judge Levy) discussed federal court "Do's and Don'ts" and answered questions from participants. Magistrate Judge Anthony P. Patti and Hooper Hathaway attorney Angela L. Jackson then provided similar advice during their presentation on discovery practice, offering their different perspectives of how lawyers should conduct discovery in federal court.

Heidi Naasko from Dykema next presented on Pro Bono Practice. She shared several stories of her experience performing pro bono work, conveying the extensive need for volunteers throughout the Detroit area and the tremendous benefit of providing pro bono legal assistance. For those interested in civil work, Judge Victoria A. Roberts provided a thorough overview of Federal Subject Matter Jurisdiction and Removal to Federal Court.

For those interested in criminal practice, Judge Laurie J. Michelson and David DuMouchel from Butzel

provided interesting and helpful suggestions on Criminal Practice in Federal Court. Finally, Stan Bershad, of Goldstein, Bershad, & Fried presented on Bankruptcy Practice, offering many amusing anecdotes from his practice.

At the conclusion of the first day's presentations, participants formally were admitted to the federal court in a mass swearing-in event over which Judge Arthur J. Tarnow presided. Family members of many participants were on hand to witness this memorable moment.

The second day of the seminar focused on the practice of law in the state courts and was moderated by Tyler Knurek of Secrest Wardle, a newly admitted attorney. The day began with an introduction by Syeda Davidson of Burgess, Sharp, & Golden, the Chairperson of the Young Lawyers Division of the State Bar. Davidson discussed the importance of participating in bar and community events and maintaining work life balance. She also discussed the various programs that provide opportunities for inexperienced lawyers to be mentored by more experienced counsel.

Alan Gershel, Grievance Administrator, discussed the most common types of grievances filed against newer attorneys, often for inadvertent things, and how to avoid issues. Gershel also spoke about the importance of responding to a notice of grievance in a timely fashion, since the failure to respond can result in discipline even when there is no merit to the underlying claim.

The second day continued with presentations by experienced practitioners in a variety of subject areas. Kay Malanay from Hainer & Berman, P.C. spoke on Domestic Relations and discussed how to negotiate and structure a settlement to avoid future litigation, and

strategies for resolving contested issues efficiently. First time speaker Alredo Casab from Dawda Mann spoke on Basic Real Property Transactions, and also provided a checklist to make documents clear and (hopefully) uncontestable. Sole practitioner Lawrence Pepper reviewed basic probate transactions, drafting effective probate documents, and practice strategies.



*David DuMouchel, District Judge Laurie J. Michelson, and Chapter President Jeff Appel at the New Lawyers Seminar.*

*Photo courtesy of the New Lawyers Seminar Committee.*

Cathrine Wenger, in-house counsel with Art Van Furniture, provided an overview of Employment Law and discussed the importance of pre-dispute policies, and procedures and practices to avoid litigation and better protect the employer in the event of litigation. She also provided suggestions for both plaintiffs and defendants at various stages of proceedings in the event of litigation, including the use of administrative proceedings to conduct no-cost discovery. Andrea Hamm from Miller Cohen discussed ways to protect the rights of an employee injured on the job and strategies for effectively prosecuting or defending Workers' Compensation claims.

Peter Kupelian from Clark Hill next discussed Alternate Dispute Resolution, including the differences between mediation and arbitration, recommendations for the most effective use of each, and various ways that ADR can be effective in a variety of practice areas.

Other speakers included Albert Dib on Evaluating and Litigating Personal Injury Claims. Participants chuckled when he shared the number of "no cause" verdicts he received as an inexperienced lawyer and how, through tenacity and a focus on continuous learning, he ultimately became a successful trial attorney. Albert also discussed how to screen clients and some of the business aspects of a sole or small practice.

*A panel of federal law clerks at the New Lawyers Seminar included: Marie Coombs, Kimberly Altman, moderator and AUSA Sarah Cohen, Jesse Taylor, and Jim Carroll.*

*Photo courtesy of the New Lawyers Seminar Committee.*

(continued on page 10)

## New Lawyers *(from page 10)*

Brian Legghio, a former criminal AUSA and current defense attorney, discussed practicing criminal law in state courts. Legghio provided practical suggestions for how an attorney can most effectively provide a defendant with the level of defense required by the Constitution. He also provided techniques for jury selection, cross-examination, and advising a defendant on whether to testify.

Mid-way through the state day, attendees were treated to lunch at the Doubletree Hotel. Wayne County Circuit Judge Patricia Fresard was the guest speaker. Judge Fresard presented an overview of practice in the 3rd Judicial Circuit. She provided some background on the structural changes that the Wayne County Circuit has employed over the last 20 plus years to improve its operations and efficiency. Additionally, Judge Fresard explained the various divisions within the 3rd Judicial Circuit clarifying where particular cases will be managed and how they are assigned.

Chapter President Jeffrey Appel also made an appearance and welcomed the new lawyers to practice in the state and federal courts.

Co-chairs for the seminar Christine Dowhan-Bailey, Cathrine Wenger, Grant Gilezan, and Lauren Mandel

thank the speakers for their on-going support of this program. All are busy practitioners who volunteer their time to speak at the seminar and prepare material, and many speakers have presented for 20 or more years.

## Law Clerk Happy Hour

On October 19, 2017, the Chapter's Law Clerk Committee hosted a happy hour for current federal law clerks working in the Eastern District. The event was held at the Avalon Café in Detroit.

Over pizza and libations, law clerks from various chambers had the opportunity to mingle and meet their colleagues. The event was attended by clerks from the chambers of Sixth Circuit Judges Damon Keith and Eric Clay, and District Judges Robert H. Cleland, Avern Cohn, Sean F. Cox, Gershwin A. Drain, Nancy G. Edmunds, Mark A. Goldsmith, Denise Page Hood, Laurie J. Michelson, Victoria A. Roberts, and George Caram Steeh.

The Law Clerk Committee sponsors numerous events to help current and former law clerks maintain connections made during their clerkships, including with their respective judges. The Committee hopes to host another happy hour next fall.



# Calendar of Events

**Feb. 7**     **Augmented and Virtual Reality Seminar**
Presented by the Intellectual Property Committee
Theodore Levin Courthouse, Detroit Room, Room 115
Noon – 1:00 PM
Members: $20 | Nonmembers: $30   Includes lunch!

**Feb. 27**     **Wade H. McCree Jr. Award Luncheon**
The Westin Book Cadillac Detroit, 1114 Washington Boulevard, Detroit, MI, 48226
11:30 AM     Reception
12:00 PM     Luncheon
Members: $45 | Non-Members: $60 | Clerks: $35
Keynote Speaker: Christopher Ilitch, President and CEO, Ilitch Holdings, Inc.
Nominations due: February 2

**March 1**     As a thank you to our Sustaining and Executive Affiliate Members, we are hosting a
**Sustaining and Executive Affiliate Members Reception** at the Miller Canfield Law Firm,
150 W Jefferson, Detroit, MI 48226
4:30 – 6:30 PM
If you would like to come and are not yet a Sustaining Member but would like to upgrade your
membership, it's not too late!  Email Executive Director Mindy Herrmann at fbamich@fbamich.org

**March 21**     **Criminal Practice Seminar**
Theodore Levin Courthouse, Detroit Room, Room 115
11:00 AM – 1:00 PM
Members: $14 | Nonmembers: $29  Includes lunch!

**March 23**     ***The Art of Pleading: Civil Rights & Employment Law After Iqbal***
Theodore Levin Courthouse, Detroit Room, Room 115
3:00 – 5:00 PM
Panelists: District Judge Judith E. Levy and Professor Alexander A. Reinert. Moderator: Robin Wagner.
Sponsored by the Chapter, the Civil Rights Law Section of the national FBA, and the Labor and Employment
Law Section of the State Bar of Michigan
Free admission, but please RSVP to fbamich@fbamich.org.  Donations accepted

**April 24**     **Leonard R. Gilman Award Luncheon**
Atheneum Suites Hotel International Banquet & Conference Center, 400 Monroe St, Detroit, MI 48226
11:30 AM     Reception
12:00 PM     Luncheon
Members: $45 | Non-Members: $60 | Clerks: $35
Nominations due March 30

**May 1**     **Law Day at the Courthouse: A Downtown Tradition**
Welcoming your staff, clients, and downtown neighbors to visit the Courthouse and the Judges,
11:00 AM until 1:00 PM
Live demonstrations, such as bomb-sniffing dogs, and tours of the Courthouse; Ask the Lawyer;
hot dogs and chips. Don't miss it this year.

**June 21**     **39th Annual Dinner** *featuring:*
• Election and installation of Officers and Board Members
• The Ninth Annual Julian Abele Cook, Jr. - Bernard A. Friedman Civility Award to be presented
  in recognition of a civil practitioner who is an outstanding example of professional excellence and civility.
Nominations for Civility Award open.
5:30 PM     Cocktails
6:30 PM     Dinner
Atheneum Suites Hotel International Banquet & Conference Center, 400 Monroe St, Detroit, MI 48226
Members: $100 | Non-Members: $120 | Clerks/Junior Members: $80
Table Sponsorships available: $1,200
Nominations for Cook-Friedman Award due: May 25

**June 25**     **Chapter Golf & Tennis Outing and Dinner**
Venue to be determined.
To register a foursome, email lemanski@butzel.com.

**Updates and further developments at www.fbamich.org**

**Federal Bar Association**
**E. D. Michigan Chapter**
P.O. Box 5249
Northville, MI 48167-1544

**RETURN SERVICE REQUESTED**

PRESORTED
STANDARD
U.S. Postage
PAID
Wyandotte, MI
PERMIT #153

**Executive Director**
Melinda Herrmann
Phone: (313) 408-2857
fbamich@fbamich.org



**Newsletter Committee:**

Christina L. Farinola,
Co-Editor in Chief
Career Law Clerk to
Hon. Anthony P. Patti
(313) 234-5200

Andrew J. Lievense,
Co-Editor in Chief
Assistant United States Attorney
(313) 226-9665

Judge Michael J. Riordan
Michigan Court of Appeals
(313) 972-5662

John P. Mayer
(734) 558-5593

Lauren N. Mandel
Career Law Clerk to
Hon. Linda V. Parker
(313) 234-5148

Jennifer L. Newby
Assistant United States Attorney
(313) 226-0295

Ashlie D. Depinet
Staff Attorney, U.S. District Court
(313) 234-5081

Derek R. Mullins
Honigman
(313) 465-7312

# Exhibit 8

# Thank you to the 2023-2024 Sustainers of Our Chapter*

| | |
|---|---|
| Christine Dowhan-Bailey | |
| Dennis Schultz | |
| Jennifer Grieco | Altior Law |
| Kenneth Neuman | Altior Law |
| James Amberg | Amberg & Amberg, PLLC |
| Dean Amburn | Amburn Law PLLC |
| Andrew McGuinness | Andrew J. McGuinness, Esq. |
| Daniel Klimek | ASG Investigations |
| Michael Asher | AsherKelly, Attorneys at Law |
| Jacqueline Kelly | AsherKelly, Attorneys at Law |
| Gary August | August Law, PLLC |
| Erica Fitzgerald | Autoneum |
| Sharon Woods | Barris, Sott, Denn & Driker, PLLC |
| Rodney Glusac | Bernardi, Ronayne & Glusac, P.C. |
| Rachel Selina | Berry Moorman, P.C. |
| Melinda Buurma | BHMB Law PC |
| John Below | Bodman PLC |
| Mackenzie Clark | Bodman PLC |
| Michelle Czapski | Bodman PLC |
| Robert Diehl | Bodman PLC |
| Stephen Dunn | Bodman PLC |
| Amanda Empey | Bodman PLC |
| Gary Fealk | Bodman PLC |
| Jeffrey May | Bodman PLC |
| Ralph McDowell | Bodman PLC |
| Jane Quasarano | Bodman PLC |
| Jeffrey Raphelson | Bodman PLC |
| Joseph Shannon | Bodman PLC |
| Thomas Tallerico | Bodman PLC |
| Brian Trumbauer | Bodman PLC |
| Kathleen Bogas | Bogas & Koncius PC |
| Jodi Schebel | Bowman and Brooke LLP |
| Jamie Nisidis | Braun Kendrick Finkbeiner PLC |
| Mitchell Piper | Braun Kendrick Finkbeiner PLC |
| Frank Angileri | Brooks Kushman PC |
| Keefe Brooks | Brooks Wilkins Sharkey & Turco |
| Kevin Clark | Brooks Wilkins Sharkey & Turco |
| Brad Danek | Brooks Wilkins Sharkey & Turco |
| Andrew Fromm | Brooks Wilkins Sharkey & Turco |
| Jason Killips | Brooks Wilkins Sharkey & Turco |
| Julie Kosovec | Brooks Wilkins Sharkey & Turco |
| Edward Kronk | Brooks Wilkins Sharkey & Turco |
| Matthew Letzmann | Brooks Wilkins Sharkey & Turco |
| Daniel Sharkey | Brooks Wilkins Sharkey & Turco |
| Sara Gorman Rajan | Brown Borkowski Morrow |
| Aaron Shuman | Buhl, Little, Lynwood & Harris, PLC |
| Cheryl Bush | Bush Seyferth PLLC |
| Stephanie Douglas | Bush Seyferth PLLC |
| Derek Linkous | Bush Seyferth PLLC |
| Susan McKeever | Bush Seyferth PLLC |
| Roger Meyers | Bush Seyferth PLLC |
| Moheeb Murray | Bush Seyferth PLLC |
| Patrick Seyferth | Bush Seyferth PLLC |
| George Donnini | Butzel Long |
| David DuMouchel | Butzel Long |
| David Atallah | Carlson Gaskey & Olds PC |
| Steven Susser | Carlson Gaskey & Olds PC |
| Tracey Lee | Chief Legal Counsel |
| Robin Ferriby | Clark Hill PLC |
| Cynthia Filipovich | Clark Hill PLC |
| Brian Shekell | Clark Hill PLC |
| Paul A. Wilhelm | Clark Hill PLC |

| | |
|---|---|
| Dennis J. Clark | Clark Law Firm PLLC |
| Charlotte Croson | Croson Taub & Michaels, PLLC |
| Joseph Michaels | Croson Taub & Michaels, PLLC |
| Adam Taub | Croson Taub & Michaels, PLLC |
| Christopher | Darrow  Darrow Mustafa P.C. |
| Deborah Gordon | Deborah Gordon Law |
| Sarah Gordon | Thomas Deborah Gordon Law |
| Dennis Barnes | Dennis M. Barnes, PLLC |
| Jeffrey Crapko | Department of Justice |
| Zachary Pelton | Dickinson Wright PLLC |
| Grant P. Gilezan | Dykema Gossett PLLC |
| James Hermon | Dykema Gossett PLLC |
| Thomas Schehr | Dykema Gossett PLLC |
| Erin Sedmak | Dykema Gossett PLLC |
| Adam Forman | Epstein, Becker & Green, P.C. |
| Barry Fagan | Fagan McManus P.C. |
| Jennifer McManus | Fagan McManus P.C. |
| Thomas Porter | FCGA |
| James Gerometta | Federal Defender Office |
| David Fink | Fink Bressack |
| Nate Fink | Fink Bressack |
| Kelly Walters | First State Bank |
| William Altman | Fisher Phillips LLP |
| Gregory Murray | Fisher Phillips LLP |
| Todd Flood | Flood Law PLLC |
| Brittney Kohn | Ford Motor Company |
| Destiny Sykes | Foster, Swift, Collins & Smith |
| Conor Fitzpatrick | Foundation for Individual Rights and Expression |
| Tami Salzbrenner | Frank and Frank PLLC |
| Billy Jeffers | Godfroy, Wetzel & Jeffers, PLC |
| Lauren Penrod | Gordon Rees Scully Mansukhani |
| Marisa Copes | Greenfelder Copes |
| Harold Gurewitz | Gurewitz and Raben PLC |
| Margaret Raben | Gurewitz and Raben PLC |
| Michael Hale | Hale & Hirn, PLC |
| Thomas Bishoff | Hickey Hauck Bishoff Jeffers & Seabolt |
| Andrew Gonyea | Hickey Hauck Bishoff Jeffers & Seabolt |
| Mark Hauck Hickey | Hauck Bishoff Jeffers & Seabolt |
| Patrick F. Hickey | Hickey Hauck Bishoff Jeffers & Seabolt |
| Benjamin Jeffers | Hickey Hauck Bishoff Jeffers & Seabolt |
| Stefanie Reagan | Hickey Hauck Bishoff Jeffers & Seabolt |
| Scott SeaboltHickey | Hauck Bishoff Jeffers & Seabolt |
| Benjamin Shipper | Hickey Hauck Bishoff Jeffers & Seabolt |
| Tamara White | Holzman Law, PLLC |
| Angela Gamalski | Honigman |
| J. Michael Huget | Honigman |
| Jeffrey Lamb | Honigman |
| Len Niehoff | Honigman |
| Robert Riley | Honigman |
| Matthew Schneider | Honigman |
| Khalilah Spencer | Honigman |
| Mark A. Stern | Honigman |
| Deborah Swedlow | Honigman |
| Leigh Taggart | Honigman |
| Adam Wenner | Honigman |
| I. W. Winsten | Honigman |
| Angela Jackson | Hooper Hathaway, P.C. |
| Joseph Barber | Howard & Howard |
| Robert Graziani | Howard & Howard |
| Patrick McCarthy | Howard & Howard |
| Howard Gurwin | Howard E. Gurwin, P.C. |
| David Haron | Hoyer Law Group, PLLC |
| Noah Hurwitz | Hurwitz Law PLLC |
| James Thomas | James C. Thomas, P.C. |

**9**

*(continued on page 10)*

## Sustainers *(from page 9)*

| | |
|---|---|
| James Alexander | JAMS ADR |
| Linda Hylenski | JAMS ADR |
| Hon. Denise Langford Morris (Ret.) | JAMS ADR |
| Hon. Lita M. Popke (Ret.) | JAMS ADR |
| Hon. Wendy Potts (Ret.) | JAMS ADR |
| Clarence Pozza Jr. | JAMS ADR |
| Hon. Victoria Roberts (Ret.) | JAMS ADR |
| Hon. Gerald Rosen (Ret.) | JAMS ADR |
| Hon. Phillip Shefferly (Ret.) | JAMS ADR |
| James Kelly | Jim Kelly Law, PC |
| Michael Carroll | Kerr Russell & Weber PLC |
| Fred Herrmann | Kerr Russell & Weber PLC |
| Ryan Bohannon | Kienbaum Hardy Viviano |
| Eric Pelton | Kienbaum Opperwall Hardy & Pelton, PLC |
| John Sier | Kitch Attorneys & Counselors |
| Rebecca Waisanen | Kitch Attorneys & Counselors |
| Michael Komorn | Komorn Law PLLC |
| Jeffrey Appel | Law Office of Jeffrey S. Appel |
| John Freeman | Law Office of John Freeman, PLLC |
| Lisa Dwyer | Law Office of Lisa Dwyer |
| Michael Hamblin | Law Office of Michael J. Hamblin |
| William Winters | Law Office of William J Winters III |
| Bradley Friedman | Law Offices of Bradley J. Friedman |
| Corey Haines | Law Offices of Corey K. Haines |

| | |
|---|---|
| David Steingold | Law Offices of David S. Steingold PLLC |
| Robert June | Law Offices of Robert June, PC |
| Cathrine Wenger | La-Z-Boy Incorporated |
| Lillian Diallo | Legal Warriors, PLLC |
| Michael Leib | LeibADR LLC |
| Hans Massaquoi | Lewis & Munday PC |
| Samuel E. McCargo | Lewis & Munday PC |
| Marla Linderman Richelew | Linderman Law PLLC |
| Nicholas Andrews | Liss, Seder & Andrews, PC |
| Earle Erman Maddin | Hauser Roth & Heller PC |
| Victor Mansour | Mansour Law, PC |
| Amy Marino | Marino Law, PLLC |
| Mark Shreve | Mark Shreve PLLC |
| John Benko | McDonald Hopkins PLC |
| Michael A. Rataj | Michael A. Rataj PC |
| K.J. Miller | Michigan Catastrophic Claims Association |
| Tania Morris Diaz | Michigan Immigrant Rights Center |
| Lynn Helland | Michigan Judicial Tenure Commission |
| Frederick Acomb | Miller Canfield Paddock & Stone PLC |
| Matthew Allen | Miller Canfield Paddock & Stone PLC |
| Michael Coakley | Miller Canfield Paddock & Stone PLC |
| Thomas Cranmer | Miller Canfield Paddock & Stone PLC |
| Saul Green | Miller Canfield Paddock & Stone PLC |
| Amy Johnston | Miller Canfield Paddock & Stone PLC |
| A. Michael Palizzi | Miller Canfield Paddock & Stone PLC |
| Elisa Angeli Palizzi | Miller Canfield Paddock & Stone PLC |
| Kimberly Scott | Miller Canfield Paddock & Stone PLC |
| Kenneth M Mogill | Mogill & Lemanski PLLC |
| Hon. Mona Majzoub (Ret.) | Mona K. Majzoub Dispute Resolutions PLLC |
| Michael Hanna | Morgan & Morgan |



**AVALON** | Detroit's Litigation Support Experts

CONTACT AVALON TODAY

Achieve more at your firm by taking advantage of our world-class litigation support services, including **eDiscovery, digital forensics,** and **managed review.** Our experts will build customized solutions and deliver uncompromising service that allows you to overcome your challenges, amplify your capabilities, and achieve your goals.

**PAUL SMITH**
*Account Executive*

248.864.2245
paul.smith@teamavalon.com
**www.avalonlegal.com**

SOC 2 Type 1 Service Provider • 92 Lifetime NPS • RelativityOne Silver Partner

| | |
|---|---|
| Mayer Morganroth | Morganroth & Morganroth PLLC |
| Mayer Morganroth | Morganroth & Morganroth PLLC |
| Roger Myers | Myers & Myers PLLC |
| Eisha Vatsal | Novara Law |
| Jason Turkish | Nyman Turkish PC |
| Margaret (Meg) Alli | Ogletree Deakins |
| Daniel Cohen | Ogletree Deakins |
| S. Rae Gross | Ogletree Deakins |
| Mami Kato | Ogletree Deakins |
| Joshua Lushnat | Ogletree Deakins |
| Thomas Paxton | Ogletree Deakins |
| Heather Ptasznik | Ogletree Deakins |
| Daniel Villaire | Ogletree Deakins |
| Craig Schoenherr | O'Reilly Rancilio PC |
| Jennifer Lord | Pitt McGehee Palmer Bonanni & Rivers PC |
| Michael Pitt | Pitt McGehee Palmer Bonanni & Rivers PC |
| Robin Wagner | Pitt McGehee Palmer Bonanni & Rivers PC |
| Patrick Lannen | Plunkett Cooney |
| Cheryl D. Cook | Potestivo & Associates, P.C. |
| Hon. Fred Mester (Ret.) | |
| | Retired Circuit Court Judge |
| Katy Dobrowitsky | Rivenoak Law Group, P.C. |
| Robert Harrison | Robert Harrison & Associates |
| Margaret Debler | Rosati Schultz Joppich & Amtsbuechler |
| Nicholas Roumel | Roumel Law |
| Sarah Prescott | Salvatore Prescott Porter & Porter |
| Jennifer Salvatore | Salvatore Prescott Porter & Porter |
| Fritz Damm | Scopelitis,Garvin |
| Justin Grimske | Secrest Wardle |
| Sheldon Toll | Sheldon S. Toll PLLC |
| Hana Attar | Signature Healthcare Services LLC |
| Arvin Pearlman | Sommers Schwartz |
| Kevin Stoops | Sommers Schwartz |
| Jason Thompson | Sommers Schwartz |
| Matthew Turner | Sommers Schwartz |
| Jay Yasso | Sommers Schwartz |
| Jesse Young | Sommers Schwartz |
| Tracy Clark | Steinberg Shapiro & Clark |
| Mark Shapiro | Steinberg Shapiro & Clark |
| Brian Farrar | Sterling Attorneys At Law PC |
| Steve Fishman | Steve Fishman |
| Hon. Steven Rhodes (Ret.) | |
| | Steven Rhodes Consulting |
| Kimberly Bedigian | Stevenson & Bullock, PLC |
| Charles Bullock | Stevenson & Bullock, PLC |
| Elliot Crowder | Stevenson & Bullock, PLC |
| Sonya N. Goll | Stevenson & Bullock, PLC |
| Ernest Hassan | Stevenson & Bullock, PLC |
| Michelle Stephenson | Stevenson & Bullock, PLC |
| Michael A. Stevenson | Stevenson & Bullock, PLC |
| David Dragich | The Dragich Law Firm PLLC |
| Judith Gracey | The Gracey Law Firm, PLLC |
| Jack Mazzara | The Mazzara Law Firm, PLLC |
| E. Powell Miller | The Miller Law Firm PC |
| Andrew Saperstein | The Saperstein Law Firm, PLLC |
| Erika Hart | The Taunt Law Firm |
| Matthew Taunt | The Taunt Law Firm |
| Thomas McNeill | Tom McNeill ADR, PLLC |
| Tammy Lundstrom | "Trinity Health" |
| Matthew Lund | Troutman Pepper LLP |
| Carl D. Gilmer-Hill | U.S. Attorney's Office |
| Jennifer Newby | U.S. Attorney's Office |
| Susan Fairchild | U.S. Department of Justice |

*(continued on page 12)*

## Calendar of Events

**May**

**May8**
 **Executive Board Committee Co-Chair Meeting**

**May 17**
 **Nominations of Cook-Friedman Award Due**

**May 22**
 **Past Presidents' Luncheon**
 Fishbones
 12pm-1:30pm

**June**

**June 11**
**2024 Annual Dinner**
Westin Book Cadillac
5:30pm-8:00pm

Please join us for this important chapter event featuring the presentation of the 2024 Cook-Friedman civility award, recognition and thank you to the members of our amazing bench, election of chapter officers, and a fun time with friends and colleagues! This is an important chapter event and one you won't want to miss! REGISTRATION COMING SOON! Sponsorships Available - Regular Sponsorships based on firm size. Can pay online (subject to 3% processing fee) or via US Mail. LARGE Firm Sponsorships (for firms with 15 or more attorneys) / comes with 8 seats to the Annual Dinner): $1400.00 MEDIUM Firm Sponsorships

**June 19**
**Copyright Trolls and Image Piracy, and Update on the Copyright Claims Board**
ZOOM @ 12:00pm - 12:50pm

Join the Intellectual Property Committee of our chapter along with Assistant Professor or Law Melissa Eckhause of the University of Detroit Mercy Law School or a lunchtime Webinar entitled: Copyright Trolls and Image Piracy, and Update on the Copyright Claims Board This is a FREE event and open to all. We encourage non chapter members to join our chapter at the home page of our website. Click https://fbamich.tradewing.com/events/syuQEpopDWs8J4XJSto to register for this exciting event!

**July**

**July 10**
**Advanced Trial Training Program (full day)**
$140 members
$215 for non-members/guests

**August**

**August 8**
 **Bench/Bar Golf Outing**
 Northville Hills Golf Club

**Updates and further developments at**
**www.fbamich.org**

**Log-in with your user name and password FIRST in order to save time and obtain Member pricing**

**Federal Bar Association
E. D. Michigan Chapter**
P.O. Box 5249
Northville, MI 48167-1544

PRSRT STD
US POSTAGE
PAID
Permit #6067
Detroit, MI

**Executive Director**
Melinda Herrmann
Phone: (248) 231-7887
fbamich@fbamich.org



WINNER
20 YEARS
National FBA
Outstanding
Newsletter
AWARD

**Newsletter Committee:**

Zainab S. Hazimi Co-Editor in Chief
Warner Norcross + Judd LLP
(248) 784-5169

Jessica Lefort Co-Editor in Chief
University of Michigan Law School
(734) 647-4036

Katelyn Crysler
Warner Norcross + Judd
(313) 546-6088

Shannon Duggan
Honigman LLP
(313) 465-7664

Lauren N. Mandel
Career Law Clerk to Hon. Linda V. Parker
(313) 234-5148

Susan Pinkowski
Case Manager to Hon. David M. Lawson
And Hon. Paul D. Borman
(313) 234-2662

Timothy Smith
Warner Norcross + Judd
(313) 546-6147

Michael D. Hanchett
Plunket Cooney
(248) 594-8689

## Sustainers *(from page 11)*

| | |
|---|---|
| Alex Meyers | United Community Housing Coalition |
| Andrew Lievense | United States Attorney's Office |
| Annie Malayang Daley | United States District Court |
| Lauren Mandel | United States District Court |
| Margaret Costello | University of Detroit Mercy School of Law |
| Barbara McQuade | University of Michigan Law School |
| Brendan Best | Varnum LLP |
| Ven Johnson | Ven Johnson Law, PLC |
| Susan Cook | Warner Norcross & Judd LLP |
| Jonathan Lauderbach | Warner Norcross & Judd LLP |
| Andrew Backing | Weitz & Luxenberg P.C. |
| Paul Novak | Weitz & Luxenberg |
| Charles Chamberlain | Willey & Chamberlain LLP |
| William Swor | William W Swor, PC |
| Alexander Ayar | Williams, Williams, Rattner & Plunkett, PC |
| Peter C. Bolton | Wolfson Bolton Kochis PLLC |
| Anthony J. Kochis | Wolfson Bolton Kochis PLLC |
| Scott A. Wolfson | Wolfson Bolton Kochis PLLC |

*Sustainers of Our Chapter list as of 3/30/2024*

# Exhibit 9



**Andrew Kamal** <andrew@starkdrones.org>
to Ryan, Eric, Kimberly, bcc: Andrew

Tue, Jan 6, 12:25 PM (4 days ago)

Dear Mr. Bohannon,

I believe it would be more reasonable to schedule the additional half-day deposition after the fact discovery deadline. This would allow me sufficient time to complete the necessary motion to compel. This extra time to be done virtually was granted to you by the judge so there is no need to rush it before January 9th.

We can meet and confer once you have had a reasonable amount of time to review the motion and the ETA data already in your possession. We can then discuss a new date to ensure the deposition is conducted in a timely manner and without haste.

This would also allow you time to review that 300GB of data you already have, the motion to compel and deposition transcript I am still awaiting availability for, so that redundancy might be minimized on the next deposition.

Please let me know if this works for you.

Best regards,
Andrew Kamal
...

One attachment • Scanned by Gmail ⓘ ▵ Add to Drive

KIENBAUM HARDY
VIVIANO PELTON F

**Ryan Bohannon**
to me, Eric, Kimberly

Tue, Jan 6, 1:01 PM (4 days ago)

Mr. Kamal,

A deposition constitutes fact discovery and, thus, cannot be scheduled after the fact discovery deadline. During today's conference, Judge Michelson made clear that she would not extend any dates and that she wanted your deposition to proceed immediately. She further noted that your deposition would help the Court narrow the scope of the discovery you are seeking. When we proposed January 8 during the conference, you did not object to that date.

To be clear: I am not required to review Ford's ESI production, your pending motion, or engage in further meet and confer discussions before proceeding with your deposition. Under Federal Rule of Civil Procedure 26(d)(3), method of discovery can be used in any sequence—meaning, Ford is not required to delay your deposition due to the documents you are requesting.

We are therefore noticing your deposition for January 8, 2026, and arranging for a court reporter and videographer. Should you refuse to appear, we will promptly file a motion to compel your attendance.

Ryan
...

**Andrew Kamal** <andrew@starkdrones.org>
to Ryan, Eric, Kimberly, bcc: Andrew

Tue, Jan 6, 1:30 PM (4 days ago)

Dear Mr. Bohannon,

I disagree with your analysis, however, I plan to attend the deposition. Please send me the information needed to appear remotely on that date.

Thank you.

Best regards,
Andrew
...

One attachment • Scanned by Gmail ⓘ ▵ Add to Drive

# Exhibit 10

 Gmail

**Andrew Kamal <andrew@starkdrones.org>**

## January 6th. Deposition Cancellation
13 messages

---

**Andrew Kamal** <andrew@starkdrones.org>                                    Fri, Jan 2, 2026 at 1:59 PM
To: Ryan Bohannon <rbohannon@khvpf.com>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>
Bcc: Andrew Nassief <kamalandrew55@gmail.com>

> The deposition scheduled for January 6 is hereby canceled, and I will not be appearing. The specific grounds for this
> cancellation will be outlined in a forthcoming letter to you. These grounds include, in part, concerns regarding the manner
> in which the deposition has been conducted, deviations from our prior understanding that the primary purpose of the
> deposition was to assist Ford in narrowing and finding the discovery (as a reminder I have already passed the
> presumptive limit for deposition), and the additional matters referenced in the letter submitted to the Court.
>
> A formal complaint will also be filed with the Attorney Grievance Commission of the State Bar of Michigan and with the
> Office of Attorney General Dana Nessel, especially in light of KHVPF's representation of the Macomb County Executive
> and the Macomb County Public Works Office and the significant public interests implicated.
>
> Best regards, Andrew

---

**Ryan Bohannon** <rbohannon@khvpf.com>                                    Fri, Jan 2, 2026 at 2:12 PM
To: Andrew Kamal <andrew@starkdrones.org>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>

> Mr. Kamal,
>
> I'm just getting back to work today following the holiday and was going to write to setup a time to talk and propose a plan
> moving forward. Are you available? I can be free in about 15 minutes.
>
> Your deposition is already scheduled. Canceling at this last minute without proper justification could incur costs, which we
> will insist that you pay.
>
> Ryan
>
> Ryan D. Bohannon
> 280 N. Old Woodward
> Suite 400
> Birmingham, MI 48009
> O: (248) 645-0000
> C: (586) 215-9426
> rbohannon@khvpf.com
>
> This communication may contain confidential or legally privileged information.  If you believe you have received it in error,
> please notify the sender immediately and delete this message without copying or disclosing
>
> > On Jan 2, 2026, at 1:59 PM, Andrew Kamal <andrew@starkdrones.org> wrote:
> >
> >
> > [Quoted text hidden]

---

**Andrew Kamal** <andrew@starkdrones.org>                                    Fri, Jan 2, 2026 at 2:27 PM
To: Ryan Bohannon <rbohannon@khvpf.com>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>

Dear Ryan,

Acting in bad faith constitutes proper justification for this cancellation. While you have suggested an offline discussion, the letter already submitted to the Court outlines multiple reasons for this decision, and as previously stated, a forthcoming letter will provide further detail.

The current conduct of the deposition deviates significantly from our previous arrangement. I have crucial matters to attend to; however, I am open to a different arrangement if Ford intends to address actual discovery needs and allow for the deposition of the individuals I have requested during that time slot.

Best regards,

Andrew Kamal

[Quoted text hidden]

---

**Ryan Bohannon** <rbohannon@khvpf.com>                                   Fri, Jan 2, 2026 at 2:31 PM
To: Andrew Kamal <andrew@starkdrones.org>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>

No one is acting in bad faith and you don't have legitimate grounds to unilaterally cancel a deposition. Again, if you continue on this path and Ford is hit with court reporter and videographer costs due to the late cancellation, we will pass those costs on to you and file a motion if necessary.

I have read your submission and, while we disagree with your accusations, we have a discovery proposal for you. Let me know if you're free to discuss.

[Quoted text hidden]

---

**Ryan Bohannon** <rbohannon@khvpf.com>                                   Fri, Jan 2, 2026 at 2:53 PM
To: Andrew Kamal <andrew@starkdrones.org>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>

Mr. Kamal,


I had a free minute so I tried to call you. I have a call on another matter at 3pm that will end around 4pm. If you're free at 4pm, please let me know so we can discuss these discovery issues.


Ryan

[Quoted text hidden]

---

**Andrew Kamal** <andrew@starkdrones.org>                                 Fri, Jan 2, 2026 at 2:54 PM
To: Ryan Bohannon <rbohannon@khvpf.com>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>
Bcc: Andrew Nassief <kamalandrew55@gmail.com>

Dear Ryan,

Thank you for confirming that you have a discovery proposal.

I request that you provide the details of this proposal to me in writing. Unless a written proposal is received and agreeable to me, I must insist that the cancellation of the January 6th deposition proceeds as outlined in my previous communication.

Best regards,

Andrew Kamal

[Quoted text hidden]

---

**Ryan Bohannon** <rbohannon@khvpf.com>                                    Fri, Jan 2, 2026 at 3:18 PM
To: Andrew Kamal <andrew@starkdrones.org>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>

We need to get on the phone and discuss. I'm available at 4. Let me know what works for you.

[Quoted text hidden]

---

**Andrew Kamal** <andrew@starkdrones.org>                                   Fri, Jan 2, 2026 at 3:31 PM
To: Ryan Bohannon <rbohannon@khvpf.com>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>
Bcc: Andrew Nassief <kamalandrew55@gmail.com>

Dear Ryan,

It is concerning that you continue to insist on off-the-record discussions while deviating from our prior arrangement. The conduct during the recent deposition—such as providing conflicting timelines for discovery review along with various other issues at hand seem problematic.

Furthermore, although you claim to have a discovery proposal, you seem unwilling to provide the details in writing. If you believe this is an appropriate way to conduct discovery, yet remain unwilling to facilitate the depositions I have requested or put your plan in writing, then we clearly lack a path forward.

Unless you are prepared to submit your proposal in writing for review, I must insist that the cancellation of the January 6th deposition stands.

Best regards,

Andrew Kamal

[Quoted text hidden]

---

**Ryan Bohannon** <rbohannon@khvpf.com>                                    Fri, Jan 2, 2026 at 5:56 PM
To: Andrew Kamal <andrew@starkdrones.org>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>

Mr. Kamal,

I have honored every arrangement with you, discussed your case in the upmost of good faith, and treated you with nothing but respect, even when you pursued irregular tactics like moving to strike our entire Answer. I conducted your deposition exactly as I have conducted hundreds of depositions across my career—professionally and appropriately. This is an adversarial process, so you should expect that I'm going to represent my client. But we can be adversaries respectfully without making frivolous accusations.

As we discussed, one purpose of your deposition was to narrow the issues, and hopefully limit the overbroad discovery you were seeking to what was truly relevant. We accomplished that, in part, and I need the second half of your deposition to continue. I requested a call to discuss a discovery plan efficiently with you through direct conversation rather than protracted email exchanges. I don't mind documenting that conversation or agreement; I wanted a verbal discussion because it is more efficient.

Let me be clear: you lack any legitimate basis to cancel a deposition with less than two business days' notice, especially when discovery closes next week. If you press forward on this path, we will likely file a motion and seek Ford's costs for

being forced to do so. It is no excuse that you suddenly decided on Christmas Eve to flood us with emails. Among those emails you stated—for the first time—a desire to depose five witnesses. You have possessed months to identify deponents. Throughout this litigation—from the initial joint discovery plan to the last status conference with the Court—you have represented to the Court that you did not intend on taking depositions. As you know, Ford operates on virtual shutdown during these final two weeks of the year. So the requests you sent on Christmas Eve can't be answered until Monday, January 5. You thus gave us a very short window to provide you a response to your request and unilaterally threatened to cancel your deposition before that opportunity even opened.

My availability to discuss these matters has closed today. While I would prefer a discussion, I'm happy to send you an outline of our view of the best path forward in discovery, taking into consideration your requests. Regardless of our ability to agree on all of your requests, your deposition should proceed as schedule to avoid needless delay.

If you would like to discuss, I can make myself available this weekend at your convenience. If not or if I don't hear from you, we will cancel your deposition at 1pm on Monday per your instruction.

Ryan

[Quoted text hidden]

---

**Andrew Kamal** <andrew@starkdrones.org>                                    Fri, Jan 2, 2026 at 6:43 PM
To: Ryan Bohannon <rbohannon@khvpf.com>
Cc: "Cynthia J. Petty" <CPetty@khvpf.com>, Eric Pelton <epelton@khvpf.com>
Bcc: Andrew Nassief <kamalandrew55@gmail.com>

Dear Mr. Bohannon,

Regrettably, I have proposed a means for us to convene on January 6th, which entails concentrating on the pertinent discovery issues and conducting depositions of the witnesses. However, you seem unwilling to consent to this arrangement.

Concurrently, you have created this pressing timeline for yourself, and aside from my desire to depose the witnesses—which has now been raised prior to January 5th, due to your insistence on my attendance—I have sent a letter to the judge, in which you are copied, to avert any potential ex-parte communication.

You have not responded until now, and I have maintained a courteous demeanor up to this point. If you think it is acceptable to inform someone that they have had ample time to review the discovery, only to then state that "we sent you that information yesterday", or if you believe it is suitable for discussions on your end to be off the record or that context is irrelevant, you may explain that to Judge Michelson and the relevant parties.

If a notice given nearly two weeks in advance, regardless of whether a company is undergoing a shutdown, is deemed inappropriate by you, then a notice provided on the day or the business day prior for discovery should not be considered suitable, especially if you are attempting to imply during the deposition that the plaintiff (myself) had sufficient time to review the discovery.

In addition to this and diverging from our agreement—which is why I initially permitted you to exceed the presumptive limit—there are further inconsistencies. It is neither fair nor appropriate for your side to possess more rights than I do, and this appears to be the conduct your firm has exhibited recently, including a lack of apology for accumulating discovery up until the deposition day, among other issues, while instead attempting to threaten sanctions to achieve your objectives.

If this is how you operate after 16 years in the industry and numerous depositions, and you perceive no wrongdoing on your part, I find this to be concerning.

Best regards, Andrew
[Quoted text hidden]

---

**Ryan Bohannon** <rbohannon@khvpf.com>                                      Sat, Jan 3, 2026 at 5:46 PM
To: Andrew Kamal <andrew@starkdrones.org>
Cc: Eric Pelton <epelton@khvpf.com>, Kimberly Matis <kmatis@khvpf.com>

Mr. Kamal,

Per your request, I write to outline Ford's discovery proposal. Before doing so, I must clarify the status quo—that is, what discovery each party is entitled to pursue under the Federal Rules and the Court's current scheduling order absent our reaching an agreement.

**The Legal Framework**

Federal Rule of Civil Procedure 16(b)(3)(A) requires scheduling orders to "limit the time to … complete discovery." The discovery deadline in this case is January 9, 2026. Courts in this district consistently interpret "complete" to mean that discovery requests must reach opposing parties with sufficient time remaining for responses before the deadline expires. *See Burton v. Michigan Dep't of Corr.*, No. 20-cv-12501, 2023 WL 11829996, at *3 (E.D. Mich. June 22, 2023) ("a party must serve his discovery requests at least thirty days before the court-ordered discovery deadline to be timely and to necessitate a response"). Under these legal standards, any new written discovery requests must have reached Ford by December 10, 2025 to allow completion before the January 9, 2026 deadline.

**Your Christmas Eve Emails Violate These Requirements**

Your December 24, 2025 letter and emails violate the discovery rules on multiple grounds:

*First*, your correspondence—sent after you repeatedly represented to the Court throughout this 16-month litigation that you would not take any depositions—violates Rule 30(b)'s deposition notice requirements. You have never properly noticed a deposition, and you now lack sufficient time to do so. *See* Fed. R. Civ. P. 30(b)(1); *Colorbok, Inc. v. Creative Int'l, LLC*, No. 07-cv-11538, 2008 WL 11355066 (E.D. Mich. Nov. 12, 2008) (request for five depositions with mere days' notice was unreasonable). Moreover, you sent these emails (1) on Christmas Eve, (2) during Ford's two-week holiday shutdown, (3) with less than two weeks remaining in discovery—making witness contact impossible until next week and leaving only days to complete depositions. And it is not reasonable to extend the schedule for you to take discovery at the last minute, when you did expressly said you were not taking such discovery throughout the case, including in multiple direct representations to the Court. *Good v. BioLife Plasma Services, LP*, 656 F.Supp.3d 738 (E.D. Mich. Feb. 16, 2023) (denying party's request to extend schedule to take limited deposition where that party failed to pursue discovery diligently despite ample opportunity).

*Second*, to the extent your correspondence was intended to serve any written discovery requests, the requests exceed the January 9 deadline because responses cannot be completed within the remaining time. *Burton, supra*.

Accordingly, absent our reaching an agreement, you are not entitled to take any no new written discovery or depositions under the Federal Rules. Ford therefore need not respond to your untimely December 24 emails.

**Ford's Proposal**

Despite the untimeliness of your requests, Ford proposes the following resolution:

1. **Your Deposition (January 6, 2026)**: You attend as noticed and as you agreed to. To make this more convenient for you, Ford will permit remote attendance via videoconference link provided by the court reporter.

2. **Independent Medical Examination (IME)**: You will agree that Ford has the right to defer any Independent Medical Exam under Rule 35 until after the Court rules on summary judgment. In cases like this, where you've alleged $2 million in emotional distress damages, routinely require an IME to assess the claim. However, if the Court grants summary judgment, this examination becomes unnecessary and Ford does not wish to put you through this process unless it is absolutely necessary. Through a stipulated order, Ford will commit to conducting the IME only if the case survives summary judgment instead of now, sparing you this procedure unless it becomes truly necessary.

3. **Written Depositions**: Your Christmas Eve emails raised the prospect of serving interrogatories in place of depositions. In case you did not know, Federal Rule of Civil Procedure 31 authorizes depositions by written questions. Although such requests exceed the discovery deadline, Ford will agree—in exchange for items 1 and 2 above—to answer written depositions under Rule 31 addressed to three Ford witnesses.

4. **Existing Discovery**: This arrangement preserves both parties' rights to continue pursuing previously served, timely discovery.

5. **Continue to "Meet and Confer"**: We do expect to make another supplemental production, possibly as early as next week, and we will continue to meet and confer with you in good faith following the conclusion of your deposition.

Regardless of this proposal, we want to reiterate that you possess no legitimate basis to unilaterally cancel a properly noticed deposition to which you previously agreed. If you refuse to attend or force Ford to file a motion to compel, the Court will order your attendance and Ford will seek an award of attorney fees and costs for the unnecessary motion.

Please confirm by Monday, January 5, at 1:00 PM that you will attend your January 6 deposition remotely as noticed. Also, advise whether you accept or reject Ford's proposal. Failure to respond or rejection means Ford will oppose all new discovery and seek an order compelling your deposition at your expense.

[Quoted text hidden]

---

**Andrew Kamal** <andrew@starkdrones.org>                                    Sat, Jan 3, 2026 at 6:36 PM
To: Ryan Bohannon <rbohannon@khvpf.com>
Cc: Eric Pelton <epelton@khvpf.com>, Kimberly Matis <kmatis@khvpf.com>, Michelle Beveridge <mbeveridge@khvpf.com>
Bcc: Andrew Nassief <kamalandrew55@gmail.com>

Dear Mr. Bohannon,

At the outset, your reliance on Federal Rule of Civil Procedure 16(b)(3)(A) as justification for requiring thirty days' notice for a deposition appears misplaced for several reasons.

1. The deposition notice you served did not, in fact, provide thirty days' notice.
2. You noticed my deposition despite delays in discovery caused by your side, and despite being aware that I was actively working on a pending motion. Discovery doesn't happen backwards.
3. While you contend that your actions are timely, you have repeatedly produced discovery materials up to the eve of the deposition. In your own words, "We do expect to make another supplemental production, possibly as early as next week," which suggests this pattern will continue.
4. Such practices—producing discovery materials immediately before a deposition—are generally disfavored by the courts, as has already been pointed out in this email thread.
5. Despite these issues being raised, you have declined to acknowledge any procedural impropriety or prejudice caused on your end.
6. During the deposition, you stated that I had ample time to review discovery, yet you continued to produce supplemental materials up until the day of the deposition. This is misleading and may raise concerns under the ABA. You were given a copy of certain applicable ABA provisions even at my deposition.

7. When I initially agreed to exceed the court's presumptive limit, I did so under the impression—based on your representations—that these depositions were necessary to clarify technical matters or to assist you in properly narrowing where to look for the discovery.

8. When I emphasize that context matters, and you minimize or disregard such context, it is unsurprising that I would now seek to depose certain witnesses during this late in the discovery phase.

9. You have created procedural and scheduling deficiencies and now appear to be attempting to use those deficiencies to my disadvantage.

10. You cannot create a double standard benefitting yourself, your firm, or your clients. Such conduct undermines judicial efficiency and fairness.

11. Any ability to now attend remotely does not render points 1 through 10 irrelevant, nor does it justify proceeding with the deposition nonetheless. Your continued denial of any wrongdoing has exposed both you and your firm to potential liability, and judicial efficiency significantly outweighs any concern over court reporter fees. The intent reflected in Ford's Proposal, point no. 5, together with your conduct during the previous deposition, provides sufficient grounds to decline any consent to exceed the presumptive limits set by Federal and State courts. Moreover, employing Independent Medical Examinations as a negotiation tactic is, at best, highly questionable.

Best regards,
Andrew Kamal

---

**Andrew Kamal** <andrew@starkdrones.org>                                    Mon, Jan 5, 2026 at 11:15 AM
To: Ryan Bohannon <rbohannon@khvpf.com>
Cc: Eric Pelton <epelton@khvpf.com>, Kimberly Matis <kmatis@khvpf.com>, Michelle Beveridge <mbeveridge@khvpf.com>
Bcc: Andrew Nassief <kamalandrew55@gmail.com>

Dear Mr. Bohannon.

Consent versus implied consent are two different things. We initially agreed what the scope of deposition was which is why I agreed to go over a presumptive limit provided by the federal courts during the time of the discovery plan. Discovery usually is completed before deposing and not done backwards. You have had ample time to submit discovery and instead waited tell days leading up to my initial deposition. I was even concerned about my initial deposition as evident in part of the meeting notes in which I emailed you on December 12:

"Second, you indicated that more documents are forthcoming, specifically the Chronicle Logs, Rally stories, GitHub logs, and Archer Logs. While this production (which I am waiting upon) is appreciated, it still represents less than half of the total discovery I have requested to date. The Fact Discovery deadline is approaching and this is concerning."

You have noticed me for that deposition also less than half the time established by federal courts as an appropriate time to depose and I was uncomfortable deposing at this point because of the motion I was already needing to work on. When stating this, you stated via phone that if I don't appear in the deposition that Ford is able to prejudice my arguments and it became narrowly clear that point number 7 in my last email,

"7. When I initially agreed to exceed the court's presumptive limit, I did so under the impression—based on your representations—that these depositions were necessary to clarify technical matters or to assist you in properly narrowing where to look for the discovery."

was not the point you actually intended for deposition all along.

That said, I still went. You told me in the deposition that I had plenty of time to review discovery despite piling up discovery up until the day or business day before. When I am under oath, this form of doing things haphazardly by your firm puts me at liability. You also have not informed me beforehand of Mr. Kloman's attendance to hear the deposition virtually which we never formally agreed upon.

Despite this you are saying to the court everything is consensual.

Even the way the initial deposition is worded, it includes:

on Tuesday, January 6, 2026, beginning at 9:00 a.m., and continuing thereafter from day

to day until concluded, at the Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd.,

Does that mean that Ford can have unlimited Depositions day after day even though I already completed my 7 hours for the presumptive limit? This is why I asked after the Deposition is over if we are meeting tomorrow and you asked me which day in January I am available.

The other issue is that you never formally noticed me proper even for the deposition that I canceled.

I am not a big fan of these types of arguments, but you are trying to use the court's 30 day notice and proper noticing rules against me despite neither deposition had a proper consensual 30 day notice. This includes the notice you gave on December 23rd for the "RUNITED STATES DISTRICT COURT" which doesn't exist. I pointed out that error the day after and also sent a letter to the judge on some of the abnormalities of your firm's conduct. You never responded to that letter you were copied on and up until now have never fixed that mistake, and have not serviced me via mail for the deposition that is tomorrow. None of this can be fixed timely or within 30 days of the deposition you seem to assert was professionally noticed.

After doing the presumptive limit required by the court for up to 7 hours, there is no reason I should be forced at this point to go over, especially given how disorganized discovery and the deposition timeline has been. At the same time, you have gone to multiple meet and confers with me late, which I let go, but these organizational issues lead me to believe that the judicial integrity of this case is at hand. From now on, all our meet and confers should be recorded and I can give you a recording along with my meeting notes afterwards (if agreeable) due to your firm's organizational skills putting me at risk.

You have then decided to email the court administrator (before even the 1PM deadline you gave me) and have stated, "Despite good faith efforts to resolve this dispute, Plaintiff has refused to provide alternative dates or appear for his deposition". This is misleading and if you state my refusal, you must be referring to the letter sent to the judge nearly 11 days ago because you have not directly asked me for alternative dates for deposition and there is no reason to at this moment given I already did the 7 hour limit for deposition.

[Quoted text hidden]

**CERTIFICATE OF SERVICE**

I, Andrew Magdy Kamal, Plaintiff, hereby certify that on this 17th day of January 2026, I served the following documents via the Court's Pro-Se Filing System, which will send electronic notice of filing to all counsel of record:

1. Motion for Recusal of District Judge

2. Exhibits in Support.

The documents were served via certified mail on the following registered attorney(s):

> Ryan D. Bohannon (P73394)
>
> Kienbaum Hardy Viviano Pelton & Forrest, P.L.C.
>
> 280 N. Old Woodward Ave., Ste. 400 Birmingham, MI 48009
>
> (248) 645-0000
>
> rbohannon@khvpf.com

This service is executed in compliance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern District of Michigan.

Dated this 17th day of January 2026.

Respectfully Submitted,

s/Andrew Magdy Kamal/

_____

Andrew Magdy Kamal,

Plaintiff in *pro per*

*801 W. Big Beaver Rd.*

*Ste. 300 MB #38*

*Troy, MI 48084*

*(616) 541-9038*

*andrew@starkdrones.org*